**In the Matter of D. H. OVERMYER CO., INC. (37 cases), et al.**

**Nos. 73 B 1126–1162, 73 B 1175 and 73 B 1189.**

United States District Court, S. D. New York.

Sept. 27, 1974.

---

Booth, Lipton & Lipton, New York City, for receiver; by Edgar H. Booth, Will B. Sandler, and Michael R. Kleinerman, New York City, of counsel.

Levy, Levy & Ruback, New York City, for debtors and debtors-in-possession; by Gary L. Blum, New York City, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for landlord-purchasers in Nos. 73 B 1128, 1129, 1134, 1143 and

1157; by Theodore Gewertz, Allen P. Rosiny and Denis F. Cronin, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, for landlord-purchasers in Nos. 73 B 1128, 1131, 1132, 1134, 1146, 1149 and 1151; by Harry A. Margolis and Daniel A. Zimmerman, New York City, of counsel.

Krause, Hirsch & Gross, New York City, for landlord-purchasers in No. 73 B 1130; by G. Oliver Koppell and John F. Scheffel, New York City, of counsel.

Bachner, Tally & Mantell, New York City, for landlord-purchasers in Nos. 73 B 1130 and 1158; by Martin D. Polevoy, New York City, of counsel.

McManus & Ernst, New York City, for landlord-purchasers in No. 73 B 1134; by Solomon E. Star, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for landlord-purchasers in Nos. 73 B 1134 and 1155; by Alvin K. Hellerstein, Gerald D. Fischer and Lawrence M. Handelsman, New York City, of counsel and Cushing, Cullinan, Hancock & Rothert, San Francisco, Cal.; by Jerome Sapiro, Jr., San Francisco, Cal., of counsel.

Jacobs, Persinger & Parker, New York City, for landlord-purchasers in No. 73 B 1131; by Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel.

Zalkin, Rodin & Goodman, New York City, for landlord-purchasers in Nos. 73 B 1134 and 1141; by Richard S. Toder, New York City, of counsel.

Reavis & McGrath, New York City, for landlord-purchasers in No. 73 B 1142; by Stephen R. Steinberg and David C. Birdoff, New York City, of counsel.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for landlord-purchasers in No. 73 B 1144; by Harold P. Weinberger, New York City, of counsel.

Arutt, Nachamie & Benjamin, New York City, for landlord-purchasers in No. 73 B 1146; by Howard R. Slater, Chicago, Ill., of counsel.

Henry & Brecker, New York City, for landlord-purchasers in No. 73 B 1149; by Martin F. Brecker, New York City, of counsel.

WERKER, District Judge.

The Receiver and the Debtors in possession of the D. H. Overmyer Corporations (hereinafter collectively called "Overmyer") appeal to this Court from judgments and orders of the Honorable Roy Babitt, Bankruptcy Judge, made on August 6, 1974.[1] The Bankruptcy Judge ordered the termination of leases between Overmyer and the landlord-appellees and required Overmyer to surrender possession of leased premises to the landlords.

The organization and business activities of the Overmyer corporations are fully set forth in the opinion of the Bankruptcy Judge. For the purposes of this appeal it will only be necessary to describe them briefly.

Overmyer was in the business of long-term leasing of warehouse space from landlords and short-term subleasing of such space to subtenants.[2] Overmyer purchased parcels of land, arranged for financing and construction of warehouses on the properties, and then sold the warehouses to the landlords involved in this appeal under lease-back arrangements. The landlords were mainly investors content to play passive roles in the operation of the warehouses. Overmyer operated and maintained the premises, paid real estate and other taxes, and attempted to find subtenants in

---

1. The Debtor is prosecuting this appeal with respect to 24 of the premises. The Receiver is not appealing the decisions in the following cases: Miami # 99; Pittsburgh # 4 & 5; Hartford # 2B; San Francisco #8; El Paso # 1; Columbus # 2; Columbus # 4; and Jackson # 2. (Throughout the proceedings below each case was identified by the geographic location of the warehouse involved.)

2. Overmyer also owned approximately 20 properties in fee.

each case who would pay a higher rental than that which Overmyer owed to its landlord.

The leases between Overmyer and the landlords were prepared by Overmyer, and were long-term, usually over 30 years in duration. Rentals were calculated to give the landlord a fixed return on his investment. In contrast, the leases between Overmyer and the subtenants were short-term with rentals in excess of the amount paid by Overmyer. Overmyer's profits were, in each case, keyed to its ability to find subtenants.

Over a period of years, relations between Overmyer and the landlords deteriorated. A number of factors contributed to the landlord's disenchantment with Overmyer including: late rental payments, and in some cases nonpayment of rent; failure to pay real estate and other taxes; allowing insurance to lapse; and failure to make needed repairs. As a result, several landlords began proceedings in state and federal courts to recover possession of their properties. Finally, on November 16, 1973, the parent corporation and approximately thirty-six of its subsidiaries filed petitions for arrangements under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1970). A receiver was then appointed to operate the business of the debtor and its subsidiaries.

Since the leases between Overymyer and the landlords contained bankruptcy termination clauses, virtually every landlord began proceedings to recover his property. The Bankruptcy Judge, pursuant to his equitable powers, stayed these proceedings. After six months of testimony, he issued an opinion and orders awarding possession of the warehouse premises to the landlords, and upholding the validity of the termination clauses.

The appellants assert several arguments on this appeal. First, that the Bankruptcy Judge erred in refusing to exercise his equitable power to prevent the forfeiture of the Overmyer leases. Second, that it was error for the Bankruptcy Judge to include in his decision those cases in which the landlords did not rely on bankruptcy termination clauses to recover possession. And finally, that the Bankruptcy Judge failed to make appropriate findings of facts and conclusions of law.[3] I will discuss these arguments seriatim.

■ Section 70(b) of the Bankruptcy Act, 11 U.S.C. § 110(b), reads in pertinent part:

> an express convenant [in a lease] that . . . the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same shall be enforceable.

Overmyer in the first instance questions whether this section applies through section 302 of the Bankruptcy Act, 11 U.S. C. § 702, to a Chapter XI proceeding. This question, however, has been affirmatively answered in the Second Circuit. Queens Boulevard Wine & Liquor Corp. v. Blum, 503 F.2d 202, at p. 204 (1974). See also Speare v. Consolidated Assets Corp., 360 F.2d 882 (2d Cir. 1966); Geraghty v. Kiamie Fifth Avenue Corp., 210 F.2d 95 (2d Cir. 1954).

In addition appellants argue that even if section 70(b) is applicable to a Chapter XI proceeding, the Bankruptcy

---

3. Overmyer also makes two other arguments. First, that the decision of the Bankruptcy Judge in the case known as Tampa # 3 was inconsistent with his decision in the cases on appeal. In Tampa # 3 the landlord's motion for possession was denied for the same reasons, according to Overmyer, that are present in these cases, namely: the profitability of the warehouse, the possible "windfall" to the landlord; and the rehabilitative purpose of Chapter XI. However, after reading the transcript of the Tampa # 3 case—with emphasis on the Bankrupt-cy Judge's statements on pages 44–52—the Court is satisfied that Tampa # 3 is distinguishable from the cases on appeal, particularly in view of the fact that there were no rent or other pre-petition defaults, or evidence of other inequitable conduct on the part of the debtor.

The final argument urged by Overmyer is that the Bankruptcy Judge prejudged the rights of the landlords before the trials. After reading the transcripts of all the cases on appeal, it is apparent that this argument by Overmyer has absolutely no merit.

Judge has the power, in his equitable discretion, to prevent the termination of leases containing bankruptcy default provisions. It is not every corporate entity, however, that can be successfully rehabilitated under Chapter XI, and not every Chapter XI proceeding which requires such exercise of discretion. In re Webcor, Inc., 392 F.2d 893 (7th Cir.), cert. denied, 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968). *See also* SEC v. American Trailer Rentals Co., 379 U.S. 594, 618, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965).

■ If the plan of arrangement is feasible and if it appears that there are compelling equitable and policy considerations for preventing forfeiture, then the bankruptcy default clauses may be deemed inconsistent with the rehabilitative nature of a reorganization proceeding. Queens Boulevard Wine & Liquor Co. v. Blum, *supra*, at 206; Weaver v. Hutson, 459 F.2d 741 (4th Cir.), cert. denied, 409 U.S. 957, 93 S.Ct. 288, 34 L. Ed.2d 227 (1972); In re Fleetwood Motel Corp., 335 F.2d 857 (3d Cir. 1964); Smith v. Hoboken R.R., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). While equity historically has been the forum in which forfeitures may be set aside, no one has suggested that when the equities appear to be evenly balanced or balanced on the side of the forfeiture the Court should grant such relief.

■ In the cases on appeal, the learned Bankruptcy Judge listened to the testimony of Overmyer and the Receiver as well as to that of the landlords in some forty cases. On the record it would appear that for a period of years prior to its filing under the Bankruptcy Act, Overmyer's conduct with respect to many of the landlords formed a pattern of consistent failure to meet its rent, repair, mortgage and tax obligations. Just prior to filing its Chapter XI petitions, Overmyer made promises with respect to remedying these defaults which could only have been made with an intention to deceive.[4] This modus operandi is not new to the Courts. *See* D. H. Overmyer Co. v. Frick, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). The record is barren, on the other hand, of any conduct on the part of the landlords which could in any way be described as unfair, overreaching or vexatious.

Appellants cite several cases in which courts refused to order forfeitures.[5] However, as the Bankruptcy Judge noted, these cases all involved strong elements of public interest against forfeiture. In the cases on appeal, no strong public interest is present. The Overmyer corporations are not publicly owned, and no substantial public benefit would result from their continued existence. Indeed the only "public" interest in the Overmyer reorganization is that of its creditors, and nowhere has it been denied that the landlords represent the large majority of those creditors, both numerically and financially.

It is true, as appellants point out, that no public interest militated against forfeiture in Queens Boulevard, *supra*. But it is also true that in that case other equities existed on the side of the debtor which are not found in the cases at hand. In Queens Boulevard the debtor had defaulted on only one month's rent, the landlord had suffered no finan-

---

4. An example of this type of conduct can be found in the Denver #1 case. Overmyer had not paid rent to the landlord for the months of April, May, June and July of 1973. According to the landlord, Overmyer said he was in the process of arranging a loan, and that he would have the money by October 31, 1973. Transcript of hearings on Landlord's Motion For Possession, Denver #1, March 7, 1974, at 14. The landlord agreed to accept Overmyer's personal notes for the unpaid rent. A few days before the notes were due, Overmyer told the landlord that his loan had not come through and that he would need until November 20th to make the payments. Id. at 17–18. On the 14th of November, the landlord called Overmyer and informed him that he would be coming to New York on November 19th to collect his money. At that time Overmyer assured the landlord that he would make payment. Id. at 18. Finally, on the morning of the 19th, Overmyer told the landlord that the corporation had filed Chapter XI proceedings on Friday, November 16th. Id. at 19.

5. Weaver v. Hutson, *supra;* In re Fleetwood, *supra;* Smith v. Hoboken R.R., *supra*.

cial loss as he had a security deposit to rely on, tender was subsequently made by the debtor and lastly, the debtor had been successful in his Chapter XI proceeding, and had produced an arrangement that was on the verge of confirmation.

Here, on the other hand, defaults were repetitive, long-standing, and seriously impeded the financial position of the landlords.[6] Negotiation on the continuation of the leases was an impossibility, for the experience of the landlords with Overmyer negated further forbearance.

Overmyer also argues that if this Court affirms the decision of the Bankruptcy Judge, and the leases are terminated, the landlords wil receive a "windfall." In view of the short-term nature of the subleases and the expenses involved in operating the warehouses, this so-called "windfall" is largely illusory and does not shift the balance of the equities.[7]

The plan of arrangement proposed by the receiver in these cases, unlike the one involved in *Queens Boulevard,* has been rejected by the debtors' creditor committees and found to be highly unrealistic by the Bankruptcy Judge. The proposed plan of arrangement splits the Overmyer creditors into two classes of general creditors. Class 1 consists of landlords whose leases have not been terminated. Each landlord would be paid 100% of the amount due him in cash upon confirmation of the arrangement "or such other amount as may be agreed upon between the respective landlord and respective debtor," receipt to cure any and all alleged defaults.

Class 2 creditors would consist of all other creditors including landlords already in possession of their respective properties. Under the plan they would be paid 1% of the amount owed every two months. The plan also provides for the merger of all the debtor corporations into one, the elimination of all guarantees of the Overmyer subsidiaries' obligations and the creation of a sixty day grace period for all deferred payments. There is no explanation in the plan as to how these payments are to be financed.

Finally, it should be noted that the *Queens Boulevard* decision was an exception to the general rule of enforceability of bankruptcy forfeiture clauses.[8] As the Court there stated:

Our decision does not deprive Section 70(b) of its statutory effect in those cases to which it is applicable. Bank-

6. Testimony at several of the hearings showed that because of late rental payments by Overmyer, landlords often had to borrow money to make their mortgage payments. In a few cases, the warehouses were sold at tax sales, and had to be redeemed by the landlords. In most cases, Overmyer was obligated to make mortgage payments directly to the landlord's mortgagees. As with rental payments, these payments were frequently late.

7. The record does not contain proof of the value of any "windfall." Both the receiver and the debtor append charts of projected profitability to their briefs. The projected profits are based on the assumption that the warehouses will be continuously occupied over the lifetimes of the leases. Economic prognostication is difficult enough in the short run. Such difficulty is magnified when trying to predict the condition of events thirty or forty years into the future. In addition, the expenses in running the warehouses for each landlord may well be higher than those of Overmyer. The landlords will periodically have to renegotiate their leases or find new tenants in the marketplace.

While some landlords will undoubtedly make increased profits upon repossession of the warehouses, it is pure speculation to say that all the landlords will receive a "windfall."

Overmyer also objects to the $20,000 per year allocation to each 120,000 sq. ft. warehouse for administration expenses. This figure was an approximation arrived at by the Court after listening to expert testimony and arguments of all parties. It should be noted that this figure was considered "light" by the Bankruptcy Judge and that when he asked for objections to his final approximation none were made. Transcript of Receiver As To The Over-All Overmyer Administration Cost Applicable To Each Property, April 18, 1974, at 85–89.

8. Cases upholding forfeiture pursuant to termination clauses include: Finn v. Meighan, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945); Schokbeton Industries, Inc. v. Schokbeton Products Corp., 466 F.2d 171 (5th Cir. 1972); B. J. M. Realty Corp. v. Ruggieri, 326 F.2d 281 (2d Cir. 1963); Model Dairy Co. v. Foltis-Fischer, 67 F.2d 704 (2d Cir. 1933).

ruptcy forfeiture provisions are necessary for the protection of landlords and generally are enforceable. We hold only that, under the particular circumstances of this case, termination of Queens' lease would be grossly inequitable and contrary to the salutary purpose of Chapter XI. 503 F.2d at 207.

■ Overmyer also argues that the Bankruptcy Judge failed to make specific findings of fact with respect to each individual case. In five of the cases landlords chose to rely on the rent default rather than the bankruptcy default clauses in their leases. Yet the same history of rent and tax defaults, failure to make repairs, and attempts to forestall dispossession marks these cases. In the Richmond # 1 case the landlord acted under the rent default clause in his lease and terminated the lease with Overmyer well before the Chapter XI petition was filed.

In another case (Camden # 2) the landlord sued for and won possession because of rent defaults in a summary proceeding in New Jersey. Thereafter, upon a stipulation and a consent judgment in the amount of $137,068.92, he permitted Overmyer to re-enter the premises upon condition that if the judgment were not paid by December 31, 1973 the lease agreement would terminate. The landlord was induced to enter into this stipulation on the specific assurance of the debtor that "there was no bankruptcy contemplated and as they viewed it, it would not violate [his] right to possession at the end of the year if they didn't pay it." Landlord's Motion For Possession (Camden # 2), April 11, 1974, at 14. The stipulation and judgment were signed on October 29, and filed November 9, 1973—only seven days before Overmyer began Chapter XI proceedings.

In a third case (St. Louis # 2 and # 3) the attorney for the receiver admitted on the record that the equities for the landlord were far stronger than they had been in the *Queens Boulevard* case. Overmyer's defaults in rent and taxes for the St. Louis property were substantial. The landlord sent notice of default in May and notice of termination in June, 1973. Yet when the landlord thereafter commenced an action for possession, Overmyer entered a general denial, clearly a sham answer meant only to create delay.

Likewise the history of Overmyer's unpaid taxes and failure to repair the Columbus # 3 property caused the landlord to send notice of termination on August 22, 1973, three months before the filing of Chapter XI petitions. The facts in the Denver # 4 case are much the same. In that instance the landlord was required to redeem his property at a tax sale because of Overmyer's tax defaults. As a result he too served notice of termination well before the start of proceedings under the Bankruptcy Act. In addition to the above difficulties, which appear throughout the transcripts of the hearings on each property, some landlords were obliged to sell personal assets or borrow from third parties in order to pay the mortgages on the warehouse premises.

It is true that Overmyer's main assets are the subleases which it has arranged with subtenants in each of the premises affected. It is also true that the termination of the leases will deprive Overmyer of its business. Five of the leases, however, are now terminated, or subject to termination, not under the bankruptcy clause but because of a course of conduct pursued by Overmyer which was designed to try the patience of even the most long-suffering owner. That patience was understandably exhausted by the various events outlined above. This Court cannot see how in equity or in law those leases can now be resurrected.

The fact that the Bankruptcy Judge did not in each case make separate findings of fact was neither an abuse of discretion nor a clearly erroneous decision. The essential findings with respect to the leases terminated by the landlords before and after the filing of Chapter XI petitions are contained in Judge Babitt's memorandum decision at pages 9,

10 and 11. These findings are sufficient under Bankruptcy Rule 752 [9] for they afford a clear understanding of the grounds on which the Bankruptcy Judge based his decision. It was not necessary that he set forth specific findings with respect to each individual property. Woodmar Realty Co. v. Julius, 307 F.2d 591, 593 (7th Cir. 1962). *See also* In re Metropolitan Realty Corp., 433 F.2d 676, 679 (5th Cir.), cert. denied, 401 U.S. 1008, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1970).[10]

This Court is convinced that there was no clear error by the Bankruptcy Judge with respect to the facts. It is equally persuaded that upon those findings the question which Judge Babitt was required to decide was one of law, i. e., whether upon the facts of this case and prior decisions in this Circuit he should exercise his discretion in equity to set aside the termination of the leases, whether terminated before the Chapter XI petitions or thereafter.

His power to restrain repossession in the five cases where the lease had already been terminated prior to the filing of Chapter XI petitions was limited. As Judge Weinfeld stated in In re Lane Foods, Inc., 213 F.Supp. 133, 136 (S.D. N.Y.1963):

> Since the debtor here was in possession, the Bankruptcy Court has the power to enjoin the threatened ouster for a reasonable period, if necessary, to effectuate the object of the Chapter XI proceeding. This, of course, does

not mean that the debtor is entitled to remain in possession until the proceeding is consummated . . . .

> It is a common situation for a debtor to be in default in payment of rent under a lease, and for the landlord thereby to have the right to recover possession of the premises and to terminate the lease. The filing of a Chapter XI proceeding does not deprive the landlord of that right, although the court through its injunction powers may delay the enforcement of the landlord's remedy. S. Collier, Bankruptcy, ¶ 3.15 n. 15 (14th ed. 1942).

The record in the five cases presented no evidence of fraud or overreaching which might call for resurrection of those leases, and consequently Judge Babitt's decision not to exercise his equitable power was clearly the correct one.

The evidence with respect to the other cases demonstrates a course of conduct on the part of Overmyer which warrants the exercise of discretion in the landlords rather than appellants' favor. This is especially so in light of the proposed plan of reorganization which simply cannot be characterized as feasible. It is the conclusion of this Court therefore that there was no abuse of discretion on the part of the Bankruptcy Judge in failing to exercise his discretion in favor of the appellants. It is also this Court's conclusion that Overmyer, because of the nature of its business operations,[11] and its failure to meet

---

9. This Rule is an adaption of Rule 52 of the Federal Rules of Civil Procedure.

10. The cases cited by the appellants, In re Gentile, 107 F.Supp. 476 (D.Ky.1952); and In re Ulrico Development, 311 F.Supp. 1393 (D.P.R.1970) are distinguishable. In *Gentile*, the referee declined to consider testimony offered by the Trustee as to certain financial books of the bankrupt. The district court concluded that the referee was not justified in declining to consider the testimony and remanded for a supplemental report. 107 F.Supp. at 478. In *Ulrico*, the district court judge had already made one remand to the referee with instructions that a transcript or summation of the evidence be

made. The referee on remand simply affirmed that no transcript was made. There were no findings on which the court could make a decision. In the cases on this appeal, the Bankruptcy Judge's opinion and the record of the proceedings are more than adequate to enable this court to make its decision.

11. The Overmyer empire was a product of rapid expansion. As the Supreme Court noted in an earlier case involving Overmyer, that company had built "in three years . . . 180 warehouses in thirty states." D. H. Overmyer Co. v. Frick, 405 U.S. 174, 179, 92 S.Ct. 775, 779, 31 L.Ed.2d 124 (1972).

its several obligations, simply cannot be rehabilitated.

The conclusions of law of the Bankruptcy Judge are correct. His orders are in all respects affirmed.

So ordered.