| DATE | |
|---|---|
| 1/18/79 | Disbursing agent filed report of receipts and projected disbursements. |
| 1/29 | Hearing held re: Claim # 3; taken under advisement; Mason to file memorandum by 2/7/79; Ms. Perkinson to respond by 2/14/79. |
| 3/21/79 | Order entered for disbursement of auctioneer's fees and commission. |
| 3/23/79 | Disbursing agent filed amended report. |
| * 4/5/79 | Accountant filed application for allowance of fee. |
| * 4/3 | Ordr. entrd. adjudging amounts previously allowed the Rings to be full compensation. |
| 4/4 | Memorandum, Opinion and ordr. entrd. allowing Claims # 8, 12 & 13, subordinated to claims of all general creditors. |
| * 4/11/79 | Memorandum, Opinion and Order entered in complaints # 1 & 2 RE: allowance of attorney's fees. |
| 4/13/79 | Counsel for creditors (stockholders of corporation) filed Notice of Appeal to Order of this Court of April 4, 1979. Notice of Filing of Notice of Appeal to Interested Parties. |

In The Matter of D. H. OVERMYER CO., INC. (Ohio) et al., Debtors.

Bankruptcy No. 73 B 1129.

United States Bankruptcy Court, S. D. New York.

April 22, 1980.

Robson & Toboroff, New York City, Attorneys for Debtor, Morton S. Robson, New York City, of counsel.

Booth, Lipton & Lipton, New York City, Attorneys for Receiver, Edgar H. Booth, New York City, of counsel.

Finley, Kumble, Wagner, Heine & Underberg, New York City, Attorneys for Debtor, Burton R. Lifland, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, Attorneys for Committee, Harry A. Margolis, New York City, of counsel.

Anderson, Russell, Kill & Olick, New York City, Special Counsel for the Receiver, Robert P. Herzog, New York City, Arthur S. Olick, New York City, of counsel.

## OPINION AND ORDER

JOEL LEWITTES, Bankruptcy Judge.

On November 16, 1973, thirty-seven Overmyer Corporations separately filed petitions for arrangement under Chapter XI of the 1898 Bankruptcy Act. One month later, two additional Overmyer Corporations sought relief under Chapter XI.

On or about December 5, 1973, upon application therefor, District Judge Dudley B. Bonsal appointed Robert P. Herzog, Esq., the receiver ("receiver") of these debtor corporations.[1]

On December 6, 1973, Bankruptcy Judge Babitt, to whom the Overmyer cases were originally referred, signed orders, in each of the then unconsolidated cases,[2] authorizing the Receiver, subject to the control of the Bankruptcy Court, to operate the businesses of the debtors.[3]

The Receiver retained, by order of the Bankruptcy Court, dated December 6, 1973,

the law firm of Booth, Lipton & Lipton ("Booth") to act as his attorneys.[4]

The Overmyer enterprises' parent company, D. H. Overmyer Co. Inc. (Ohio), at the time of the Chapter XI filing, to date, owns all of the outstanding shares of the capital stock of some 36 separate corporations bearing the same name, but which are organized under the laws of the separate states indicated parenthetically after the name of each. Both the parent and its subsidiaries were engaged in the business of operating warehouses throughout the United States.[5] The nature of the activities of these warehouses are set forth, with some specificity in the opinion by Bankruptcy Judge Babitt in *In re D. H. Overmyer Co. Inc.*[6] By his investiture, as Receiver, Mr. Herzog became the functional head of this vast empire.

The applications submitted by both the Receiver and Booth here recount, with fine particularity, a history of the long sojourn of the consolidated debtors in this Court during the Receiver's stewardship. We are approaching the possible close of this case and presently, before this Court, are applications for compensation by the Receiver, and Booth, the accountants to the Receiver and Special Counsel to the Receiver.

---

**1.** The jurisdictional bases for the appointment, by a Court of Bankruptcy, of a receiver, are provided for in Bankruptcy Act § 2a(3) and (5), 11 U.S.C. § 11a(3) and (5). These provisions are supplemented by Bankruptcy Rule 201, 411 U.S. 1020, 93 S.Ct. 3112, 37 L.Ed.2d xlv. It should be additionally noted that, in accordance with the former local Bankruptcy Rules of the Southern District of New York, rule 8(a), in effect at the time of the application for a receiver in Overmyer, the request for the appointment of a receiver was required to be made to the District Judge sitting in the motion part of the District Court. *Cf. In re Premier Floor Covering Co. Inc.*, 35 F.Supp. 901 (E.D.N.Y. 1940).

**2.** In March 1976, following extended hearings and submission of numerous legal memoranda, Bankruptcy Judge Babitt ordered the substantive consolidation of the numerous Overmyer Corporations. The purpose and effect of such substantive consolidation have been the subject of several decisions in this Circuit. See *e. g. Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir. 1966); *In re Flora Mir Candy Corp.,* 432 F.2d 1060, 1062–3 (2d Cir. 1970).

**3.** The significance of these orders, for the purpose of the receiver's applications before me for commissions, is that Bankruptcy Act § 48a(3), 11 U.S.C. § 76a(3), permits this Court to allow an operating receiver no more than *twice* the statutory amount of commissions allowed to a receiver acting with full powers under Bankruptcy Act § 48a(2), 11 U.S.C. § 76a(2). See 2A Collier on Bankruptcy ¶ 48.-08[1] at 1807 (14th ed. 1976).

**4.** Prior to the receivership, Booth agreed to be retained by the then bankruptcy trustee, Robert P. Herzog, as attorneys for the trustee, however Herzog's trusteeship never survived.

**5.** Indeed, the United States Supreme Court had occasion to observe, in 1972, that the Overmyer warehousing enterprise, which in three years built 180 warehouses in thirty states, was a "complex" corporate structure. *D. H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 178–9, 92 S.Ct. 775, 779, 31 L.Ed.2d 124 (1972).

**6.** 1 C.B.C. 338, 341 (S.D.N.Y.1974) (Bankruptcy Court), *aff'd* 383 F.Supp. 21, 22–23 (S.D.N.Y. 1974), ·*aff'd* 510 F.2d 329 (2d Cir. 1975).

Hearings were held by the Court in connection with the applications for final compensation and in awarding the fees to these applicants, the Court has taken into consideration the written applications therefor, both oral and written objections to the allowances, as well as replies to such objections. In addition, the Court has requisitioned critical transcripts relating to previous interim applications by some of the petitioners here as well as the complete transcript of the November 12, 1976 hearing, a portion of which the principal of the debtor, Mr. Daniel H. Overmyer, relies upon, in great part, in his objection to the applications of the Receiver and his attorneys and accountants.

■ In determining what this Court deems to be fair and reasonable fees for the professionals, we have applied the various criteria enunciated by the Courts in connection with such applications. We are told that, among the factors to be considered are ". . . the time spent, the intricacy of the questions involved, the size of the estate, the results obtained and the 'economic spirit' of the Bankruptcy Act to curtail unnecessary expenses." [7]

Of course, in determining the compensation of the Receiver, we are limited to the applicable statutory structures of Bankruptcy Act § 48, 11 U.S.C. § 76. The schedule of commissions set forth in that provision reflects only the maximum commission this Court may allow.[8]

Before we proceed to the individual applications we must take note, *inter alia*, of a major objection, alluded to above, by Mr. D. H. Overmyer, to this Court's consideration of the present applications for commissions and compensation, insofar as these applicants seek an award for the period subsequent to July 1, 1976. This contention, which we find to be wholly without merit,

is based upon the following statements by Bankruptcy Judge Babitt during the course of the November 12, 1976 statutory hearing on this case.

"I have also made up my mind that one of the ways to solve this problem which seems to bother so many people is that as far as the Court is concerned, all compensable services shall have terminated effective July 1, 1976 save those that are expressly shown to the Court not to be within the swim of the overall services of the Receiver and his counsel when they submit their final applications for compensation. So, at this point I am asking the Receiver if I permit him to remain to indeed labor for the continuation of this case without expecting any additional compensation from July 1st. That is a heavy burden to lay on any officer of this Court. That should allay any concern that this XI will become a receiver's relief act." [9]

The objectant, Mr. Daniel H. Overmyer ("objectant"), further points to Bankruptcy Judge Babitt's remarks made later during the course of the November 12 hearing that:

". . . Any applications for compensation at any stage of the proceedings whether it be at confirmation or at the liquidating bankruptcy are as of a cutoff date of June 30, 1976 for all concerned in the employ of the receiver and probably his accountants . . . .." [10]

■ If these above-quoted statements by the presiding Bankruptcy Judge were viewed in a vacuum, as the objectant apparently would have us do, perhaps we would not quarrel with him in the absence of some finding of extraordinary services rendered by the Receiver and the professionals in his employ. But surely the objectant cannot seriously expect a court to countenance such a myopic examination of the record.

---

**7.** *In re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir. 1958). See also *In re Mabson Lumber Co. Inc.*, 394 F.2d 23 (2d Cir. 1968); *Jacobowitz v. Double Seven Corp.*, 378 F.2d 405, 407 (9th Cir. 1967); *Matter of R. Hoe & Co. Inc.*, 471 F.Supp. 493, 502 (S.D.N.Y.1978).

**8.** *Cf. In re Midwest Engineering & Equipment Co.*, 440 F.2d 326, 329 (7th Cir. 1971).

**9.** Transcript of hearing, November 12, 1976, p. 181–2.

**10.** *Id.* at 187.

Rather, a careful and dispassionate reading of the November 12, 1976 hearing, in its totality, reveals that neither the Receiver, his attorney, his accountants, nor special counsel are barred from seeking an award of compensation beyond July 1, 1976 under the circumstances present here.

A major portion of the November 12, 1976 hearing, the transcript of which covers two hundred pages, was devoted to the objectant's motion, on behalf of the consolidated debtors, to terminate the receivership and to restore the debtors to possession.[11] The thrust of the objectant's motion was that in light of the conceded experience of the objectant in the operation of the warehouse business, the more manageable size of the estate, and in order to reduce the expenses of the receivership (presumably the commissions of the Receiver and the Receiver's counsel),[12] the receivership should be terminated. Doubtless, in order to assuage Judge Babitt's oft-stated apprehension in a termination of the receivership,[13] special counsel to the debtors argued that no untoward risk would be occasioned by an immediate displacement of the Receiver since the Chapter XI case was on the verge of confirmation and "[w]e are talking about ninety—a hundred twenty days to put these things together."[14] Although the Court declined to terminate the receivership,[15] in order to relieve the main concern of both the objectant and the creditors, i. e. the costs of the receivership, Bankruptcy Judge Babitt stated

". . . that the receiver and his attorneys can on the basis of hours they have earned already, for which they have not been compensated, or commissions which

he has earned, carry us for *those three months* in the status quo so it does not cost us a nickel more and by the end of those three months we will know if we are dealing with the sale of those three properties . . . which will fund a plan and if not, the case goes."[16]

Later, the Court observed:

"Don't you think I am able to note there is nothing really meaningful that has been done here since July of '76; don't you think I am better off keeping them [the Receiver and his counsel] and knowing compensation has got to be left to my somewhat less than tender hand? Isn't it as easy for the receiver now, since you say anyone can learn the warehouse business in two weeks, for the receiver to stay and wind it up in ninety days or one hundred twenty days? They know they are not going to be compensated.

". . . We are talking about ninety days. . . ."[17]

Again,

"Can I if I confirm in three months or four months and the order of confirmation revests in the debtor?"[18]

Further,

"I have pretty much set a deadline for myself [the Court] of ninety days to see a final agreement . . . for the sale of property which will yield those funds that I need to fund the now accepted plan."[19]

In view of the debtor's representation, therefore, that the case would confirm within ninety to one hundred days, we can now properly reflect upon the statement by the Court upon which the objectant would have this Court totally bar compensation to

---

11. *Id* at p. 77 *et seq.*

12. *Id* at 92.
 Apparently this objectant, at that hearing, was nevertheless content to have the Receiver's accountants continue even if the Receivership were terminated. Thus Mr. Robson, then special counsel to the debtors, stated that "[w]e would be perfectly happy to have them continue as accountants for the debtor-in-possession. . . ." *Id* at 87.

13. *Id* at pp. 81–2; See also pp. 90; 94–5; 100; 112–114; 143–4.

14. *Id* at p. 86.

15. *Id* at p. 188.

16. *Id* at pp. 105–6. (emphasis supplied).

17. *Id* at p. 120.

18. *Id* at p. 153.

19. *Id* at p. 179.

the Receiver and his counsel from July 1, 1976. Thus the Court pertinently stated:

". . . the question boils down to whether or not I should upset the status quo for ninety days or whether I should keep the status quo for ninety days.

". . . If I keep the status quo for ninety days, I suspect one of the things that has loomed large here is the fact that the receiver and his accountants and his attorneys have the right to expect compensation for those services which have been rendered for the betterment of the receivership. . . .

". . . one of the ways of solving this problem which seems to bother so many people is that as far as the Court is concerned, all compensable services shall have terminated effective July 1, 1976 save those that are expressly shown to the Court not to be within the swim of the overall services of the receiver and his counsel when they submit their final compensation. So, at this point I am asking the receiver if I permit him to remain to, indeed, labor for the continuation of this case without expecting any additional compensation from July 1st. . . ." [20]

Thus the debtor's application to terminate the receivership was denied for ninety days subject to restoration thereafter [21] and compensation to the Receiver, his attorneys

20. *Id* at pp. 180–2.

21. *Id* at p. 185.

22. *Id* at p. 184.

23. The applicants, other than special counsel, maintain that the objectant has waived and is estopped from presenting his objections to their instant applications on the ground that, at the time of the hearings on interim applications, debtor's counsel praised the efforts of the applicants. See *e. g.* Transcript of hearing, April 18, 1974 at pp. 66–7; 77–8; Transcript of hearing, July 25, 1974 at p. 30; Transcript of hearing, January 7, 1975, pp. 32–3; Transcript of hearing, June 1, 1976 at 39; 74; Transcript of hearing July 22, 1976 p. 19. We need not venture into a question—begging discourse upon whether the equitable doctrines of waiver and estoppel are applicable here. Bankruptcy Rule 219, 411 U.S. 1038–1041, 93 S.Ct. 3125–3126, 37 L.Ed.2d liii–liv, applicable to Chapter

and accountants was frozen from July 1, 1976 through the three months subsequent to the November 12, 1976 hearing. This determination was described by Bankruptcy Judge Babitt as his "less than Solomonic decision. . . ." [22] "Solomonic" or not, it is clear that the objectant's contention that the Receiver and his accountants and attorneys are barred from an award of compensation, save for extraordinary services rendered by them, from July 1, 1976 and beyond, where, as here, the case has continued for years after the three months *status quo* set by the Court, is less than candid.

We turn now to the individual applications. [23]

### The Applications

#### A. The Receiver's Application

The Receiver seeks final commissions in the amount of $207,943.59 less the sum of $81,000 which has been paid as an interim allowance, leaving a balance of $126,-943.59. [24] The request covers the period from December 5, 1973, the date of his appointment as Receiver, to the date of this application, December 31, 1978.

The basis for the Receiver's requests are as follows:

(a) Twice the commissions, in accordance with Bankruptcy Act § 48a(3) for conducting the business of the debtor, of commis-

XI cases by Bankruptcy Rule 11–31, 415 U.S. 1024, 94 S.Ct. 3248, 39 L.Ed.2d xlvi, governs "the allowance of compensation to officers, attorneys and accountants . . . [and] *is peculiarly a judicial responsibility* to supervise the administration of estates and in particular to assure that allowances for compensation to those rendering services in connection therewith are fair and not excessive. . . ." Advisory Committee's mate to Bankruptcy Rule 219.12 Collier on Bankruptcy ¶ 219.01 at 2–206 (14th ed. 1976) (emphasis supplied). Thus these applications are subject to review and supervision by the Court, and the Court's administration thereof cannot be removed by alleged waivers.

24. The Receiver's application erroneously computes his requested commissions to be six dollars more than, even according to his computation and request here, would be allowable.

sions computed under the provisions of Bankruptcy Act § 48a(2) for the period from December 5, 1973 through, January 31, 1975, *or* 2 times $91,112.17 which equals $182,224.34.

and

(b) Commissions computed in accordance with Bankruptcy Act § 48a(1) from February 1, 1975 through December 31, 1978, or $21,719.25.

less

(c) $81,000 which was previously received by the Receiver as interim allowances.[25]

As we have observed earlier, the outer limits of a receiver's commissions are statutorily set forth in the Bankruptcy Act.[26] Within the legislative confines thereof, the Court necessarily must determine what it considers to be a reasonable fee in light of "the unique fact situation of each case . . . ."[27] Certainly among the factors to be taken into account are, the results achieved by the Receiver[28] and the "fair value of the time and labor required in the performance of his duties, as meas-

ured by ordinary business standards, and the degree of activity, integrity and dispatch with which the work has been performed."[29] As noted earlier, and in addition to these general guidelines, is the pervasive "spirit of economy"[30] which quite naturally engulfs all fee applications before this, a bankruptcy court.

Several facts are clear, although disputed quite unreasonably, in my view, by the objectant.[31] First, at least until 1975, the Receiver was in fact, as well as by order of this Court, an operating receiver.[32] Second, the Receiver's endeavors, particularly during the early stages of the receivership, were critical to the very survival of the debtors. Were it not for the Receiver's devotion to his appointed duties[33], instead of the possible confirmation here, these debtors would have been relegated, early on in this case, to a swift and sure adjudication in bankruptcy.

This Court is not misled for a moment, by the debtors' attempt to denigrate the Receiver's success in this case (which, in a

---

**25.** The Receiver, in his reply to the objectant's objections to the Receiver's final account and application for allowances, indicates that he will seek, in a supplemental final report, additional commissions from certain four properties of the debtors which were necessarily turned over to the Receiver at the time of the latter's appointment, but which were sold subsequent to his effective stewardship. By order of this Court, dated January 11, 1977 the consolidated debtors were revested with their properties, as debtors-in-possession, which included the properties which were subsequent thereto sold, the proceeds of such sale which presumably will be the subject of the Receiver's soon to be claimed commissions. Although strictly speaking the Receiver had not been discharged as of the date of the sales of two warehouses and two leases, and accordingly was technically a custodial receiver under Bankruptcy Act § 48a(1), 11 U.S.C. § 76a(1), prior to the time these properties were sold, the District Court, on April 6, 1978, appointed Hon. Harold R. Tyler, Jr. as Custodial Receiver. That appointment in my judgment, effectively displaced the applicant as a Receiver, and he is not entitled to the additional commissions he projects here.

**26.** Bankruptcy Act § 48, 11 U.S.C. § 76. See also *ante* footnote 8.

**27.** *Cf. S. E. C. v. W. L. Moody & Co. Bank*, 374 F.Supp. 465, 480 (S.D.Tex.1974), *aff'd without opinion*, 519 F.2d 1087 (5th Cir. 1975).

**28.** *Ibid.*

**29.** *Bailie v. Rossell*, 60 F.2d 806, 807 (3rd Cir. 1932).

**30.** *E. g. In re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir. 1958).

**31.** See Consolidated Debtor's opposition to allowance to the Receiver, p. 5.

**32.** Quite apart from the District Court's order, dated December 5, 1973, which appointed the applicant as an operating receiver, and which specifically enumerated the scope of his authority and power as such, the record of this Chapter XI case is replete with references to the actual operations of the debtors' businesses by the Receiver. We can point to no better example of such a reference than the expression by debtors' counsel that "[w]e know for a *fact* that the receiver did spend a tremendous amount of time on the [debtors'] premises and was an *active operating receiver*. Transcript of hearing, April 18, 1974, p. 77.

**33.** See *e. g.* Transcript of Hearing, April 18, 1974, p. 86.

Chapter XI case, is largely coincident with his ability to sustain it) in seeking to charge the Receiver with "the loss of all but four of the warehouse properties operated by the Consolidated Debtors prior to the commencement of these proceedings."[34]

The record of this case demonstrably refutes such statement. Rather than to unduly expand this opinion, we note that the Receiver's reply to the Debtors' objections,[35] in this connection, accurately reflects, *inter alia*, that the lion's share of the divestment of the Debtors' properties was occasioned either by the Debtors' voluntary relinquishment of unprofitable properties or the involuntary relinquishment of properties by judicial fiat, by reason of the Debtors' "repetitive, long-standing" defaults in derogation of the rights of their landlords.[36]

 Still, we are counseled not to be vicariously generous in our awards of commissions or compensation since the "[c]osts and expenses in the administration of a bankruptcy [or a Chapter XI case] tend to reduce the amount available to creditors."[37] Accordingly, even where, as here, the Receiver has correctly computed his full statutory commissions, "[t]here is a ceiling on statutory commissions, not a mandate that the maximum must be paid."[38]

 In applying the criteria applicable to the award of a Receiver's commissions I find that reasonable compensation is $150,-000 less the amount of $81,000 previously paid to the Receiver as interim compensation, leaving a balance due to the Receiver in the amount of $69,000.

It should be noted—and this applies to *all* the requests here for compensation—that to the extent that my allowance of compensation is in an amount less than that requested, such reduction should not be construed, in any manner, as an endorsement of any of the clearly inflammatory charges levelled against any of these applicants by the objectant. Rather, my determinations are based solely upon the relevant criteria set forth in prior judicial pronouncements[39] applicable to the instant requests for compensation.

**B. Application Of Counsel To The Receiver**

Counsel requests final compensation in the amount of $750,000 plus $10,249.03 as disbursements. Counsel has been awarded, as interim compensation, the amount of $267,500, leaving a balance of claimed compensation in the amount of $482,500.

This case, insofar as counsel's application is concerned, was aptly described by Bankruptcy Judge Babitt as "a litigating monster."[40] The record of this case, from its inception in November 1973 through early 1975, indisputably reflects an unrelenting stream of litigation occasioned by irate landlords of the debtors seeking this Court's permission to regain possession of their properties. As the Court observed:

"The fact of the matter is Mr. Sandler, Mr. Kleinerman and Mr. Booth have spent an enormous amount of time just fending off the assaults made by the landlords.

"And, the examinations that have taken place have been staggering—hours, and hours and hours. . . ."[41]

---

**34.** See Consolidated Debtors' objections to the Final Account and Application for Allowance of the Receiver, p. 5.

**35.** See Receiver's Reply to Debtors' objections to Receiver's Final Account and Application for Allowances, pp. 22–25.

**36.** *In re D. H. Overmyer Co. Inc.*, 383 F.Supp. 21, 24 (S.D.N.Y.1974), *aff'd* 510 F.2d 329 (2d Cir. 1975). See also Transcript of Hearing, January 7, 1975, p. 35.

**37.** *Cf. S. E. C. v. W. L. Moody & Co., Bankers, supra* 374 F.Supp. at 483.

**38.** *In re Portage Wholesale Co.*, 216 F.2d 614, 615 (7th Cir. 1954).

**39.** See footnote 7, *ante* and footnote 47 *infra*.

**40.** See Transcript of Hearing, January 7, 1975, p. 42.

**41.** See Transcript of Hearings, July 25, 1974, pp. 34–5. See *e. g. Matter of Overmyer Co. Inc.*, 1 C.B.C. 338 (S.D.N.Y.1974) (Bankruptcy Court), *aff'd* 383 F.Supp. 21 (S.D.N.Y.1974), *aff'd* 510 F.2d 329 (2d Cir. 1975). See also *Matter of Overmyer Co. Inc.* (Fla.), 1 C.B.C. 516 (S.D.N.Y.1974) (Bankruptcy Court).

In addition to numerous adversary proceedings with the debtors' landlords,[42] we take note, as well, of counsel's extensive preparation for trial, and the trial on the substantive consolidation application.[43] Moreover, counsel conducted examinations under Bankruptcy Rule 205, and commenced lawsuits, *inter alia*, against D. H. Overmyer Telecasting Co. Inc. and the First National Bank of Boston. The applicants here have devoted a substantial amount of compensable time in connection with numerous settlement agreements with landlords, the sale of property, and the necessarily pressing legal problems which arose daily, particularly during the days of the operating receivership.[44]

The applicant's petition consists of some 388 pages and reflects total time expenditures of 6,960 hours: 6,750 hours chargeable to partners' time (approximately 97% of total time) and 210 hours attributable to associates' time (approximately 3% of total time).[45] Their request is equivalent to a mixed hourly charge of $107.75.

▇▇▇▇ An evaluation of applications, by professionals, for compensation, is admittedly not arrived at "with the ease of a computer."[46] Unlike a receiver's fee, no statutory maximum, on the basis of assets involved, governs professional fee applications.[47] Rather we must, on a case-by-case approach, apply the factors announced to us by the Courts (set forth earlier in this opinion in more summary fashion) in arriving at an appropriate, if not reasonable, allowance.

Among these factors to be considered are: (1) the nature of the services rendered; (2) the difficulties and complexities encountered; (3) time necessarily expended; (4) the results achieved; (5) the burden the estate can safely bear; (6) the size of the estate; (7) duplication of services; (8) professional standing, ability and experience of the applicant; (9) fairness to each applicant; and (10) economy of administration.[48]

We dismiss here, as we did with respect to the Receiver's application, the objectant's contention that all claims by the applicants for fees were terminated from July 1, 1976. We need not repeat our reasons for such rejection of objectant's arguments in that regard. We similarly disagree with objectant's contention that applicants "surrendered" valuable leaseholds of the estate. The record, as we observed in our discussion of the Receiver's application, pointedly contradicts that assertion.

As noted above,[49] the applicants have supplied this Court with daily time sheet records in support of the references, in their application, to time spent. Of course time spent is not the ". . . only—or even the most important—factor in granting an allowance."[50]

To be sure,

". . . preoccupation with time would reward the slow, inexperienced single practitioner and prejudice the efficient, knowledgeable attorney with a reservoir

---

**42.** See Appendix to Receiver's counsel's application.

**43.** See footnote 2, *ante*.

**44.** The operating receivership was effectively terminated on February 1, 1975 and the receiver functioned thereafter as a custodial receiver.

**45.** Daily time slip records have been supplied to the Court by these applicants. Applicants maintain that such records were utilized for fiscal management "but were not always the exclusive criterion for billing." Reply Affidavit to Objections. p. 18.

**46.** *Cf. Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

**47.** *Cf. Bankruptcy Act* § 48, 11 U.S.C. § 76.

**48.** *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir. 1959); *In re Paramount Merrick Inc., supra; In re First Colonial Corporation of America*, 544 F.2d 1291, 1298–99 (5th Cir. 1977); *Jacobowitz v. Double Seven Corp.*, 378 F.2d 405, 408 (9th Cir. 1967); *Oklahoma Ry. Co. v. Johnston*, 155 F.2d 500, 502–3 (10th Cir. 1940); *In re Imperial '400' National Inc.*, 431 F.Supp. 155, 160–1 (D.N.J. 1977); *In re Webb & Knapp Inc.*, 363 F.Supp. 423, 426–8 (S.D.N.Y.1973).

**49.** See footnote 44, *ante*.

**50.** *In re Borgenicht*, 470 F.2d 283, 284, fn. 1 (2d Cir. 1972).

of expert associates and partners upon whom to call as needed. . . ." [51]

Moreover, the weight assigned to time spent necessarily implicates an evaluation of the degree of legal services rendered. Thus, although compensable, we do not assign as "high a rate of compensation" to time "expended at uneventful meetings, routine hearings . . . and customary problems arising from the day—to—day operation of the business" as we would assign to those matters requiring the special skills and experience of the applicants.[52] Moreover, in connection with compensable services, we must gauge the deployment of the applicant's available manpower resources consistent with the legal services required.

The applicants here inform us that at the time they were returned, in December 1973, their firm was comprised of six partners and four associates.[53] It is quite clear that applicants gave their firm's highest priority to representation of the Receiver and, as such, assigned three partners to the task.[54] The petition relates that these attorneys, on numerous occasions, devoted nights, weekends and often holidays on behalf of the Receiver. Clearly, "[t]he priority given the work by the attorney is a significant factor in affixing his fee. . . ." [55] We have, however, in determining reasonable compensation for these applicants, taken note of the inordinately large percentage of billable time assigned to partners in relation of such time apportioned to associates. Even taking into account, as we have, the small size of the firm and the more often, than not, need to utilize the firm's more experienced and skillful practitioners, many of the tasks, particularly legal research and the appearance at routine hearings, did not require the almost exclusive utilization of partners' time.[56] Moreover, we have taken cognizance of the fact, related in the petition, that at many of the meetings, described therein, some of routine nature, the three partners were inexplicably and unjustifiably present.

The unacceptable rationale for such weighty partner participation, advanced by applicants, merely amounts to a sophomoric rejoinder that the consolidated debtors were similarly over-manned and unjustifiably represented at these meetings.[57] Neither are we persuaded that this overloaded participation is not now reviewable since the debtors took no exception to such course of conduct when given the opportunity to do so at the hearings on interim applications.[58] We do not mean, of course, to convey the impression that such conduct was routine, or not necessary on many occasions, but we merely observe that we have taken cognizance of several of such incidents on our road to the final determination of the allowances requested here.

We have, necessarily in abbreviated narrative, indicated the nature of the services rendered in this difficult and complex case. For nearly two and one-half years these applicants were engaged in constant courtroom combat. The fact that the outcome of some of this litigation was unsuccessful "do[es] not bar reasonable compensation for efforts expended. . . ." [59] Although it is clear that the great bulk of services were rendered from November 1973 through Jan-

---

51. *S. E. C. v. W. L. Moody & Co. Bankers, supra*, 374 F.Supp. at 486.

52. *Matter of R. Hoe & Co. Inc., supra*, 471 F.Supp. at 506.

53. See Applicants' Reply Affidavit to Objections, p. 13.

54. One of the three, Michael Kleinerman, Esq., was promoted to partner shortly after the commencement of this case. See Applicants' Reply Affidavit, p. 13.

55. *S. E. C. v. W. L. Moody & Co. Bankers, supra* at 486 (citation omitted).

56. At the time of applicants' retention, partners' time was billed at $85 to $100 per hour and associates' time in the range of $65 to $75 per hour. See Reply Affidavit to Objections, p. 18.

57. See Reply Affidavit to Objections, p. 17.

58. See Reply Affidavit to Objections, p. 9. See also footnote 23, *ante.*

59. *Cf. In re Webb & Knapp, Inc.*, 363 F.Supp. 423, 426 (S.D.N.Y.1973).

uary 1, 1976 valuable services were rendered by these applicants much beyond that date. Although interim awards of compensation were made to these applicants the rationale for such compensation is ". . . to alleviate economic hardship in protracted cases and assure the competent and efficient administration of the Chapter . . . [XI] estate. . . ."[60] They "are designed only 'to keep body and soul together' . . . ,"[61] not to make the applicant therefor whole.[62] Still, this Court must evaluate the application in tandem with the economic administration of the estate. We are told that we must strike a balance between the "economic spirit" of the Bankruptcy Act and the desire to encourage competent professionals, as here, to service estates within the precincts of this Court.[63] Although we abstain from and abjure the suggestion that fixing compensation of private practitioners should somehow be made with reference to the base salary of judicial officers or other public officials[64] we must not be vicariously generous[65] with the funds available to the debtors and creditors.[66]

■ We find reasonable compensation, as a final allowance, to be $515,000. This leaves a balance due to the applicants in the amount of $247,500. Disbursements are granted in the amount of $7,500.

### C. Application Of Accountants To The Receiver

The accountants seek a final award of compensation in the amount of $246,945 less the sum of $137,000 which has been paid as an interim allowance, leaving a balance of $109,945. Services rendered cover the period from December 1973 through July 31, 1979.[67]

In response to this application the debtors have filed an objection thereto complaining that the application fails to: (a) set forth the value and extent of services rendered; (b) set forth the extent of services rendered subsequent to July 1, 1976; and (c) is unreasonable insofar as such application subsumes work done by their former employee, Mr. Jack Taub.[68]

We are no more impressed by applicants' response that the debtors' waived objection to the value and extent of their services rendered prior to July 1, 1976[69] than we are by the debtors' argument, repeated here, that all compensation came to an end on July 1, 1976.

This Court is not an accountant. Thus, although the offer of the accountants' work product was made by applicants to this Court we are convinced that we are able, without it, to gauge the enormity of services by the very size, nature and scope of the Chapter XI debtors.

In examining the application I note that the accountants here neither place magnified emphasis on the services rendered by partners at rates usually more substantial than those charged to the services of lesser ranked personnel in the accounting firm,

**60.** *Cf. Matter of Interstate Stores, Inc.*, 437 F.Supp. 14, 16 (S.D.N.Y.1977). (citation omitted).

**61.** *Matter of Investors Funding Corp.*, 422 F.Supp. 461, 465 (S.D.N.Y.1976).

**62.** See Transcript of Hearing, January 7, 1975, p. 68.

**63.** *In re Dunhill Suspender & Belt Corp.*, 162 F.Supp. 608, 611 (S.D.N.Y.1958).

**64.** But see *Newton v. Consolidated Gas Co.*, 259 U.S. 101, 106, 42 S.Ct. 438, 440, 66 L.Ed. 844 (1922).

**65.** *In re Gilbert*, 276 U.S. 294, 296, 48 S.Ct. 309, 310, 72 L.Ed. 580 (1928).

**66.** *Mutual Life Ins. Co. v. Brock*, 405 F.2d 429, 433 (5th Cir. 1968).

**67.** The applicants were originally retained as accountants for the operating Receiver. When the consolidated debtors were authorized to become debtors in possession, the latter retained these applicants as their accountants.

**68.** Mr. Taub is now in the employ of the objectant. The debtors' objection with respect to Mr. Taub is so patently frivolous that it simply requires no comment.

**69.** See footnote 23, *ante.*

nor do they bill at rates which might be more appropriate in the non-insolvency context.[70] Moreover, it is clear that much of what the accountants did here illuminated the financial difficulty of the debtors so that creditors might know whether the debtors proposals are made in good faith and whether the debtor could survive these Chapter XI proceedings.

■ In determining fair and reasonable compensation here, the criteria governing applications for compensation by attorneys, as set forth earlier in this opinion, are relevant to the instant petition.[71] In applying those factors we find that reasonable compensation, as a final allowance, is $187,000. This leaves a balance due to the applicants of $50,000.

**D. Application Of Special Counsel To The Receiver**

■ special Counsel, Reimer & Braunstein, Esqs. were retained pursuant to an order of this Court, dated December 29, 1975, to prosecute, on behalf of the Receiver, an action in the United States District Court for the District of Massachusetts. The applicants have, to date, received $10,000. They seek a balance of compensation and disbursements in the amount of $1,704.27.[72] In my view, the applicants are entitled to compensation in the amount of $400 and $150 in disbursements.

*Summary*

For the reasons stated, petitioners are awarded final allowances for services performed in the Overmyer Chapter XI case.

| Applicant | Final Allowance | Interim Allowances Previously Paid | Balance | Disbursements |
|---|---|---|---|---|
| Robert P. Herzog | $150,000 | $ 81,000 | $ 69,000 | – 0 – |
| Booth, Lipton & Lipton | 515,000 | 267,500 | 247,500 | $7,500 |
| Weber Lipshie & Co. | 187,000 | 137,000 | 50,000 | – 0 – |
| Riemer & Braunstein | 10,400 | 10,000 | 400 | 150 |

SO ORDERED.

*Epilogue*

It is beyond dispute that the Receiver, his counsel and accountants, have valiantly toiled in this Court on behalf of the estate in one of the most grueling and arduous Chapter XI cases inaugurated in this District. Unfortunately, these applicants have not only been faced with problems expectantly addressed to their professional skills, but they have been afflicted with an unprecedented collage of innuendo, rumor and invective. The fall-out of such has even occasioned the precipitous displacement of my colleague, the learned, distinguished and honorable Bankruptcy Judge from presiding over this case which was originally referred to him.

Regrettably, the burdens and anguish vented upon those who have been touched by this disagreeable aspect of this case, are not compensable by this tribunal.

70. Applicants in their petition state that the rates charged here are approximately 85% of their standard billing rates as adjusted from time. Application for allowance to accountants for the Receiver, p. 7.

71. *In re Dunhill Suspender & Belt Corp.*, 162 F.Supp. 608, 611 (S.D.N.Y.1958).

72. Of the $1,704.27 request, $255.77 thereof reflects reimbursements for out-of-pocket expenses.