**In re DELTA MOTOR HOTEL OF SYRACUSE, INC., Debtor.**

**Bankruptcy No. BK–78–1683.**

United States Bankruptcy Court,
N. D. New York.

April 6, 1981.

Menter, Rudin & Trivelpiece, P. C., Syracuse, N. Y., for trustee, Ralph Blum; Gerald J. Mathews, Syracuse, N. Y., of counsel.

D'Arrigo & Granito, Liverpool, N. Y., for Lessors Antonio Emmi, Carmen Emmi and Salvatore Mangano; Mario D'Arrigo, Liverpool, N. Y., of counsel.

Boone, Wellford, Clark, Langschmidt & Pemberton, Memphis, Tenn., for debtor; William Boone, Jr., Memphis, Tenn., of counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

LEON J. MARKETOS, Bankruptcy Judge.

On August 24, 1978, Delta Motor Hotel of Syracuse, Inc., (hereinafter, Debtor or Lessee under a lease dated September 8, 1966 in which Antonio Emmi, Carmen Emmi and Salvatore Mangano were Lessors), petitioned for relief under Chapter X of the Bankruptcy Act of 1898. The Hon. Howard G. Munson, of the United States District Court of the Northern District of New York, thereafter appointed Ralph Blum as Trustee and the case was referred to the undersigned Bankruptcy Judge.

On November 30, 1978, as permitted by Rule 10–112(a)(2) of the Rules of Bankruptcy Procedure, the Lessors filed an answer to the petition in which they controvert its material allegations. (See § 130 of the Bankruptcy Act). The Lessors allege that the primary, if not the sole asset of the Debtor-Lessee is the leasehold interest created by the lease and that said leasehold interest has been terminated by the operation of conditional limitation clauses following breaches of covenants in the lease. Furthermore, in accordance with provisions of the lease, a Notice of Limitation of Term dated June 19, 1978, prior to the filing of the Chapter X petition, was given to the Lessee-Debtor which terminated the lease; and that irrespective of the June 19, 1978 Notice, a further Notice of Limitation of Term dated October 27, 1978, subsequent to the filing of the petition, also caused the lease term to end.

The Lessors further allege that a plan of reorganization cannot be effected, thereby challenging the requisite good faith element of this petition. (See § 146 of the Bankruptcy Act).

A lengthy trial of the issues was had before the Court during which extensive proof was taken on the issues raised by these pleadings.

### FACTUAL BACKGROUND

The Debtor herein was the builder and operator of a Ramada Inn at the intersection of Buckley Road and Seventh North Street in the Town of Salina, Onondaga County, on land owned by the Lessors. The formal lease agreement was entered into by and between the Debtor and the Lessors on September 8, 1966 for a term of thirty (30) years, plus two additional twelve-year options.

The construction of the hotel actually began in October of 1969, when the Debtor-Lessee borrowed $1,125,000.00 from Marine Midland Trust Company (hereinafter, Marine), on an interim basis. A commitment was thereafter obtained from Guardian Life Insurance Company of America, (hereinafter Guardian), to take out the permanent mortgage. Upon assignment to Guardian monthly installments of principal and interest would be paid. In addition, Lessee was to pay an override of "10% of the gross annual room sales that exceeded $495,000.00." The usual payments of taxes, assessments, sewer and water charges, insurance, etc. were the Lessee's responsibility.

A delay in the construction of the motel caused the permanent financing commitment of Guardian to expire. A new financ-

ing agreement was made which increased the override percentage. The motel was completed on or about November 25, 1970, at which time Marine assigned the mortgage to Guardian.

In January of 1971, Delta borrowed $500,-000.00 from the Westinghouse Credit Corporation (hereinafter, Westinghouse), to finance the acquisition of furniture and fixtures.

Both aforesaid mortgage documents were executed by the Lessors. The Lessors subordinated their interest in the real estate to the first mortgage held by Guardian and the second mortgage held by Westinghouse.

The lease (Exhibit 1) required that the mortgages contain a standard provision [1] which read in relevant part as follows:

"Prior to declaring this mortgage to be immediately due and payable as a result of any event of default hereunder or under the note secured thereby for the building loan agreement herein referred to, the mortgagee shall notify said individual mortgagors [the Lessors] in writing by registered or certified mail of such default and said individual mortgagors shall have thirty (30) days from the date of delivery of such notice to any one of them in which to cure said default."

The lease also contained the usual provisions requiring the timely payment of rent, override percentage, mortgage payments, taxes, insurance, etc. and provided that in the event of a default the Lessor could do any of the following:

"1. Institute an action or actions to enforce the lease.

2. Take possession of the leased premises.... without thereby terminating the lease and on behalf of the Lessee re-let the same or any part thereof..................... Lessors may at any time after taking possession as aforesaid terminate this lease by notice to Lessee and sue for and receive from Lessee damages, including but not limited to reasonable attorney's fees incurred by Lessors.

3. Terminate this lease by notice to Lessee, re-enter the leased premises and recover damages, including but not limited to costs of re-possession, re-letting, attorney's fees and brokerage commissions for services performed by Lessors or others.

4. Exercise any other remedy allowed by law or equity."

Sec. 4.4 of the lease provided in pertinent part:

"In the event Lessee fails to remedy any default in the payment of any obligation properly due from the Lessee and secured by any such loan documents within fifteen (15) days after written notice thereof from Lessors, said failure shall constitute a default under this lease, and Lessors may, in addition to other remedies available to them, make any such defaulted payments, and in such event Lessee agrees to repay Lessors, upon demand, the full amount so paid and expended by Lessors, together with interest thereon at the rate of six percent (6%)."

From the beginning, the hotel was plagued by financial difficulties of one kind or another. In the early stages, at least three mechanics liens were filed against the premises. These were satisfied. Later, numerous defaults were made in either payment of the mortgage installments, or the override payments which are due within sixty days following the close of the Lessee's fiscal year.

In connection with the Guardian mortgage, there was a series of defaults beginning in 1976, each of which was noted by Guardian by letter to the Lessors. Each was followed by communications, usually oral between the Lessors and the Lessee and subsequently the default was cured or partially cured. This continued through the early part of 1978. On January 4, 1978, Notice of Default was sent out to the Lessors, which was followed on January 24, 1978 by a letter (Exhibit V–7) from the attorney for the Lessors to the Lessees, which read as follows:

---

1. Section 4.2 of the Lease; Section 28 of the Marine mortgage.

"We have recently been notified by the Guardian Life Insurance Company that you have failed to comply with your payment obligations pursuant to the mortgage dated October 9, 1965, as modified September 15, 1970 and January 20, 1977.

Section 4.4 of your lease with my clients, Mr. Antonio Emmi, Mr. Carmen Emmi and Mr. Salvatore Mangano states, 'In the event Lessee fails to remedy any default in the payment of any obligations properly due from Lessee and secured by any such loan documents within fifteen days after written notice thereof from the Lessor, said failure shall constitute a default under this lease . . . . . . .'

Please consider this letter as formal notice to remedy your default in payment of the mortgage.

In the event the mortgage payments are not made within fifteen days of the date of this letter, we will consider you in default under the lease and take appropriate steps to protect our interests.

> Very truly yours,
> Grasso, Rivizzigno,
> Warnoff & DiLauro
> Carmen Grasso"

Following the default of January 4, 1978, a default was noted by a Guardian letter dated February 17, 1978. Then on April 18, 1978, another default was noted by letter to the Lessors, which resulted in a Lessors' Notice of Limitation of Term being duly sent to the Lessee by registered mail.

The Notice of Limitation of Term (Exhibition XI–1) provided, in substance, that Section 4.4 of the lease had been breached by default in mortgage payments and in accordance with Section 31.1 and Article XXIX of the lease the term of the lease expired by the sending of this notice. The Notice further required the Lessee to surrender the leased premises including all permanent improvements thereon and all personal property.

It followed that on June 5, 1978, the Lessee forwarded to the Lessors a check in the sum of $2,227.74 for the June rent and due percentage of April restaurant and bar sales. This was cashed on or about June 9, 1978. The Lessee also forwarded to the Lessors on July 28, 1978 a check in the sum of $18,702.72 in payment for annual override rental under the terms of the lease which check was accepted and cashed by the Lessors.

On August 24, 1978, the Lessee filed its petition under Chapter X to effect a corporate reorganization. On October 27, 1978, the Lessors sent the Lessee a second Notice of Limitation of Term. In this instance, the Lessors were exercising an option to terminate the lease accorded to them by virtue of the Lessee's filing in bankruptcy. (Lease, Sec. 32.1). This Notice exercised a Lessors' option to terminate independent of the Notice of June 19, 1978.

One H. G. Hall (who ultimately became the sole stockholder of Delta) and several of his associates were also operators of various other subsidiary hotels in the United States. There was testimony, mostly undisputed, that assets of Delta were being used to either capitalize or finance those motels. Also, the Lessors presented evidence of certain inter-corporate transactions alleging them as "improper" conduct contributing to the Debtor's ultimate financial difficulties.

The problems relating to the Guardian mortgage were also duplicated with reference to the Westinghouse mortgage during the years of 1977 and 1978.

It appears that the Debtor had made efforts to refinance the project in 1976 and 1977. All talks with the Lessors at that time resulted in failure although the Eastern Savings Bank had apparently made a commitment to the Lessee to refinance its mortgages. The trial record reveals extensive testimony (R. 7/12/79 pp. 83–85; R. 7/13/79 pp. 129, 140, 144; R. 7/26/79 pp. 9, 14, 75–110) on the estimated value of the leasehold and its improvements. By a preponderance of the evidence it appears this concern is worth approximately $2,600,000 to $2,700,000 as a fair market value. Since its petition filing, all trade creditors and taxes have been current.

## DISCUSSION

### I.

A major contention of the Lessee is that the lease could not be terminated for non-

payment of the Guardian mortgage until the Lessors had given the Lessee fifteen days notice, with an opportunity to cure, pursuant to Section 4.4 of the lease.[2] The Lessee supports this contention by stating that Section 4.4 appears to be in direct conflict with the notice provisions of Article XXXI (Section 31.1(a)). This Court cannot find that there is a conflict or ambiguity between the aforesaid clauses. Under Section 4.4 the Lessee covenants not to permit a condition of default in any mortgage and is to perform all conditions and obligations required by the mortgage.

The third sentence of Section 4.4 is construed to be a set of conditions which when in existence together create a right in the Lessors to pay the outstanding defaulted payments on the mortgage and to be entitled to reimbursement by the Lessee. The phrase "in the event" is common contract parlance used when introducing prerequisite conditions. The fifteen-day notice provided therein is a prerequisite condition to the Lessors' right to independently cure any default in the mortgage and to be entitled to reimbursement.

The Court is cognizant of the adjectival phrase which reads "said failure shall constitute a default under this lease" which follows the proviso of fifteen-day notice from the Lessors. This phrase merely reiterates that even should the Lessors take the action to notify the Lessee of a default in the mortgage payments, the default in the mortgage is still considered a default under the lease. The new right to cure is expressly given in addition to other remedies available to the Lessors. By this construction all parts of the lease are given meaning. *Meighan v. Finn*, 146 F.2d 594, 595 (2nd Cir. 1944); *aff'd, Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945).

■ This Court, therefore, does not find that a promise or duty to notify was imposed upon the Lessors, except for the purpose of entitling them to the right to cure the defaults under Article IV and, in turn, to receive reimbursement from the Lessee.

Provisions of Section 31.1 of the lease require further examination. The Lessors take the position that a conditional limitation exists. The Lessee appears to accept the clause (31.1 remedy (3)) as a conditional limitation, but denies its applicability.

## II.

■ Conditional limitations in leasehold interests which prematurely accelerate the term of a lease have been utilized by landlords and sanctioned by the courts. This "subtle device" continues up to the present to be enforceable by legal process.[3]

According to one author, a conditional limitation in leases, is a "device for terminating the estates of defaulting tenants which has the double-edged advantage of being quick and inexpensive and being free from the hazards to which the use of the condition subsequent is subject... The only handicap to be met is in the use of an exact formula of words."[4] The difference between a conditional limitation and a condition subsequent must be carefully considered.

In *Martin v. Crossley*, 46 Misc. 254, 91 N.Y.S. 712 (Sup.Ct.App.T.1905), the Appellate Term Court said:

"The election of the landlord to take advantage of a breach of condition by entry, and thus terminate the estate, is to be distinguished from the case where, by the provision of the lease, the term is created to endure only until an option to earlier end it has been exercised by the landlord. In the latter case, upon the exercise of the option, the term 'expires' in the sense of the statute." *Id.* at 256, 91 N.Y.S. 712.

---

**2.** Pertinent provisions of Section 4.4 are set forth above.

**3.** See, *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968).

**4.** Niles, *Conditional Limitations and Leases in New York*, 11 N.Y.U.L.Rev. 15 (1933).

In *Burnee Corp. v. Uneeda Pure Orange Drink Co., Inc.*, 132 Misc. 435, at 438, 230 N.Y.S. 239 (Sup.Ct.App.T. 1st Dep't 1928), Justice Levy, quoting from *Michaels v. Fishel*, 169 N.Y. 381, 389, 62 N.E. 425, said:

"At common law the right to re-enter, except when entry can be made without force, is simply the right to maintain ejectment and we find no statute which has changed the rule."

The right to maintain ejectment, is to be distinguished from the right to maintain summary proceedings, which is a statutory remedy.

The technical, common law meaning of the term "re-enter" was to indicate an ouster by means of an ejectment suit and excluding dispossession by summary proceedings. At common law, the traditional method of removing tenants from possession was by a suit in ejectment, with all the protective remedies. Summary proceedings being statutory, are limited to those grounds specified in the statute, one of which is holdover.[5] Therefore, landlords have devised a method of obtaining the benefits of summary remedies by providing for the automatic ending or expiration of a lease upon the event of certain contingencies. This is known as a conditional limitation.

Justice Levy, in the *Burnee Corp.*, decision, supra, has set forth that there are three types of conditional limitations:

1. Where the event agreed upon is to limit the estate without further act of either party. An example would be a limitation such as "estate is to 'X' so long as he remains unmarried."

2. Where the happening is set in motion by the landlord. An example of this type of clause is one which furnishes the landlord the right to terminate the lease on a given number of days notice, in the event of a bona fide sale of the property.

3. Where there is a breach of condition on the part of the tenant of a provision inserted in the lease for the benefit of the landlord, the violation of which entitles the landlord to serve a notice electing to terminate the lease after the expiration of a certain specified time.

The case at bar, of course, is of the third type and an examination of the New York cases does not clearly establish whether "conditional limitations" will be relieved of the doctrine of strict construction. This type has not yet been tested squarely in the Court of Appeals of the State of New York. The clause gives to a landlord a summary remedy for the recovery of land for the breach of a covenant and it has been classified as a thinly veiled condition subsequent rather than a "true" conditional limitation.[6]

The New York courts, however, have insisted upon properly phrased terms of limitation where a landlord seeks to evade the slow and expensive action of ejectment.[7] Similarly, where the lease provision gave the landlord an option and an election by the landlord was necessary to terminate the lease, the term was not void but voidable and the lease only created a condition subsequent.[8]

Even if technical words of limitation are used, in each of the three classifications of cases set forth in the *Burnee* case, supra, there still is one difference which is fundamental. "There is no penalty or forfeiture when a lease is ended by a provision which allows a landlord to sell the property or rebuild; there is a penalty or forfeiture when a landlord elects to end a lease for the delay in the payment of rent or taxes, whether he does so by apt words of limitation or defeasance."[9] In the case at bar, forfeiture or penalty is obvious and close

---

5. See, § 711 of the New York Real Property Actions and Proceedings Law.

6. *Beach v. Nixon*, 9 N.Y. 35.

7. *Matter of Guaranty Building Company*, 52 App.Div. 140, 64 N.Y.S. 1056 (4th Dep't 1900); *Janes v. Paddell*, 67 Misc. 420, 122 N.Y.S. 760 (Sup.Ct.App.T.1910); *Riesenfeld, Inc. v. R–W Realty Co., Inc.*, 223 App.Div. 140, 228 N.Y.S. 145 (1st Dep't 1928).

8. *Riesenfeld, Inc. v. R–W Realty Co.*, supra.

9. *Niles*, 11 N.Y.U.L.Rev. 15, supra, at 26.

examination should be had of the words of limitation presently before the Court.

There is only one word of limitation used in the clause upon which the landlords rely; (Sec. 31.1(a), sub. para. 3) this word is "terminate". It will be noted, however, that it is followed by the words "re-enter the leased premises" which are the traditional words for the remedy of ejectment. Furthermore, the entire defeasance clause (Section 31.1 of the lease) is couched in terms of options. There is no clear-cut defeasance clause. In fact, the language of the clause clearly gives the impression that it is a lease term which is voidable not void and which would seem to violate the pronouncement of *Matter of Guaranty Trust*, supra, n.7. There are, however, New York cases which have held language similar to that before this court to be valid conditional limitations.[10]

### III.

Even if Section 31.1(a) of the lease and its accompanying remedy and notice of limitation term are to be considered as a true conditional limitation, it is necessary that this particular provision be analyzed carefully, to determine whether or not its provisions have been validly triggered into operation. Initially, we notice that it states the requisite antecedent conditions that must exist *simultaneously* before the conditional limitation in remedial paragraph (3) can be implemented.

In the event of a breach by the Lessee (in this case the default under Article IV of mortgage payments), the mortgagee is to give notice to the Lessors and when no more than five days grace period remains to cure the default under the mortgage the Lessor has the option to do any of four things, one of which is set forth in subparagraph (3) and that is to "terminate this lease by Notice to the Lessee, re-enter the leased premises and recover damages...."

The Lessors' Notice of Termination followed the April 18, 1978 default notice received by the Lessors from Guardian.

We have noted that the conditional limitation, if it is such, is of the "third type" described by Justice Levy in *Burnee*, supra. The Lessors tie a covenant in the lease (Section 4.4), its breach, along with other antecedent conditions, to the provisions for notice. (Section 31.1, remedial subparagraph (3)). There is no grace period in the Notice of Termination of Term. A *breach* in the covenant (4.4), is expressly a required prerequisite condition before any power to terminate devolves to the Lessors.

The Lessee argues that the Lessors waived "*the breach*" in the lease. There is uncontested evidence that the Lessors accepted a monthly rental payment which accrued on June 1, 1978. (Lease, Section 3.1). The Lessee timely sent a check (Exhibit XII-1) covering (1) rent due for the month of June, and (2) the rental payment of 1% of the restaurant and bar sales for the month of April, 1978. (See, Lease Section 3.1). This payment was received and deposited by the Lessors on or about June 9, 1978. Further, on July 28, 1978, the Lessee timely sent a check to the Lessors in the amount of $18,702.72 representing payment of the land lease override rent accruing on May 31, 1978. (Exhibit XXII). The check was endorsed and deposited by the Lessor. The payment covered the accrual time period of June 1, 1977 to May 31, 1978. Its basis was a fixed percentage of 4% of the gross room revenues over the Lessee's fiscal year.

It is a well settled principle of law that

"When rent is accepted with knowledge of a particular conduct which is claimed to be a default, the acceptance of such rent constitutes a waiver by the landlord of the default. (citations) The acceptance of rent is in effect an election by the landlord to continue the relationship of landlord and tenant." *Atkin's Waste Materials, Inc. v. Stephen May*, 34 N.Y.2d 422, 427, 358 N.Y.S.2d 129, 314 N.E.2d 871 (1974).

---

**10.** *Ehret Holding Corp. v. Anderson Galleries, Inc.*, 138 Misc. 722, 247 N.Y.S. 235, aff'd, 235 App.Div. 781, 256 N.Y.S. 978; *Martin v. Crossley*, supra.

The Court finds that the Lessors had clear and unambiguous knowledge of the (April) breach of covenant 4.4. The Lessors delineate it in their June, 1978 Notice of Termination of Term. There does exist a qualifying limitation to the aforesaid 'rental acceptance' principle of waiver.

"If, however, the rent accepted is rent that became *due prior to the breach*, the lessor does not concede that the lease continued in operation after the breach and *there is no waiver*. (citation)" (Emphasis added) *In re Wise Shoe Co., Inc.*, 26 F.Supp. 762, (S.D.N.Y.1938).

Therefore, the time of the occurrence of the particular breach and the date at which an accepted rent payment accrued are critical fact findings. The above narration of the facts of this case fit the requisite sequence of the aforesaid legal principles and the Court concludes that the Lessee has made out a prima facie case of waiver of default by acceptance of rental payments.

The Lessors counter this assertion of "implicit" waiver by acceptance of rent payments, by referring to an express non-waiver provision (Lease, Exhibit 1, Section 25.1) which reads

"Section 25.1 *No covenant*, term or condition of this lease to be performed by one party [lessor or lessee] *shall be waived, except by written consent* of the other party, *and forbearance or indulgence* by one party *in any regard* whatever *shall not constitute a waiver* of the covenant, term or condition to be performed by the other party, *and until complete performance* by the delinquent party *of such covenant*, term or condition, *the other party shall be entitled to invoke any remedy available under this lease* or by law or equity, *despite such forbearance or indulgence*." (Emphasis and brackets added).

This cited provision is certainly broad enough to encompass any and all acts or conduct of the Lessors that, absent such a provision, could be argued to be a manifestation of waiver of a breach under the lease. The issue now before this Court is what effect to give such a provision in light of the Lessors' acceptance of rental payments.

### A.

The Lessors cite *Luna Park Housing Corporation v. Besser*, 38 App.Div.2d 713, 329 N.Y.S.2d 332 (2nd Dep't 1972) for authority that New York law fully recognizes such non-waiver clauses in contracts as valid and enforceable. Research has brought to this Court's attention that *Luna Park* may well have had its 'stare decisis' value modified by the very same court. In the case of *Paul E. Taylor, Jr. v. Parklane Hosiery Co., Inc.*, 53 App.Div.2d 888, 385 N.Y.S.2d 380 (2nd Dep't 1976) the controversy was between a landlord and a tenant as to a lease on *commercial premises*. The landlord-plaintiff brought a complaint seeking (1) enjoinder of further violations of "use" clauses in the lease or in the alternative, (2) judgment declaring termination of the lease. The latter relief, on appeal, was implicitly abandoned by the plaintiff. The tenant-defendant interposed affirmative defenses, inter alia, estoppel and waiver. The plaintiff unsuccessfully moved the trial court to dismiss these defenses by reference to the non-waiver and non-modification clauses in the lease. On appeal, the Appellate Division affirmed. The court reviewed case law concerning non-waiver clauses in leases and concluded:

"The cases supporting plaintiff's position are primarily those relating to the rules of residential cooperative corporations (see, e. g., *Linden Hill No. 2 Coop. v. Leskowitz*, 41 A.D.2d 741 [341 N.Y.S.2d 317,] affd. 34 N.Y.2d 580 [354 N.Y.S.2d 946, 310 N.E.2d 543]; *Luna Housing Corp. v. Besser*, 38 A.D.2d 713 [329 N.E.2d 332]; *Brigham Park Co-op. Apts. Section No. 2 v. Krauss*, 28 A.D.2d 846 [282 N.Y.S.2d 938], affd. 21 N.Y.2d 941 [289 N.Y.S.2d 769]), or to the rules appended to residential leases of a private landlord (see, e. g., *Pollack v. Green Constr. Corp.*, 40 A.D.2d 996 [338 N.Y.S. 486]) prohibiting the harboring of a dog. As such, they relate to what were deemed the proper amenities and comfort of the tenants. Such fact patterns are truly *sui*

*generis* and the cited cases are not precedents for the general dismissal of such defenses in an action for an injunction." *Paul E. Taylor, Jr.,* supra at 889, 385 N.Y.S.2d 380.

The failure to dismiss such affirmative defenses can only lead this Court to conclude that a failure of a lessor to seek prompt relief on discovery of a tenant's breach of a covenant may, upon adequate proof, be deemed a waiver of the non-waiver and non-modification clauses of a commercial lease. More recently, the same Appellate Division court stated, in dictum:

> "Furthermore, it appears from the record that the landlord accepted rent with knowledge of the tenant's alleged failure..... The general rule is that the acceptance of rent with knowledge of conduct violative of the lease constitutes a waiver by the landlord of the default *even if the lease contains a nonwaiver provision.* (citations omitted)" (Emphasis added) *Patrick E. Malloy, III v. Club Marakesh, Inc.,* 71 App.Div.2d 614, 616, 418 N.Y.S.2d 135 (2nd Dep't 1979).

The above case also emerged from litigation between a landlord and tenant who were parties to a commercial leasing agreement.

This Court finds non-waiver clauses in lease agreements and their enforceability as an issue less than settled by the New York courts. At best, the commercial lease [11] appears to be excepted from prior decisional case law such as cited by the Lessors. This Court is not convinced that the Lessors' assertion of the lease's non-waiver clause would meet with probable success in the New York courts. Therefore, the Court is inclined to look at case law from other jurisdictions to fully explicate the principle of waiver by rental acceptance vis-a-vis non-waiver clauses.

### B.

If a lease contains an express provision clearly enunciating that the subsequent acceptance of rent shall not be deemed to be a waiver of any preceding breach of a lease's terms, covenants, or conditions, it has been held that under those types of *express nonwaiver provisions* a lessor cannot be found to have waived his pre-existing right of forfeiture by receipt of rent. See, e. g., *In re Wil-low Cafeterias, Inc.,* 95 F.2d 306, 115 A.L.R. 1184 (2nd Cir. 1938), *cert. denied sub nom., Wil-low Cafeterias, Inc. v. 650 Madison Avenue Corporation,* 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533 (1938); *In the Matter of Joyce Leslie, Inc.,* 3 B.R. 230 (Bkrtcy. S.D.N.Y.1977); *Karbeling v. Brothwell,* 244 Cal.App.2d 333, 53 Cal.Rptr. 335, 340–41 (App.Ct. 2nd Dist. Div. 3 1966). See generally, 49 Am.Jur.2d Landlord and Tenant, § 1068.

In *In re Wil-low Cafeterias, Inc.,* supra, the Second Circuit illuminated the equitable principle of waiver by rental acceptance vis-a-vis non-waiver clauses from which this Court quotes:

> "Waiver is always a matter of intent and, while an intent to waive may be inferred from the acceptance of rent under certain circumstances, such an inference may be rebutted and is rebutted here by the express agreement between the parties that the rent was paid and accepted without prejudice. Such an agreement was incorporated in the leases. The fourth paragraph quoted provided that 'the receipt of rent with knowledge of any breach, shall not be deemed to be a waiver as to any breach of any covenant or condition herein contained.' Thus, notwithstanding knowledge of a breach of condition, the appellant might accept rent without being deemed to waive his right to terminate for such breach. [Citations]." 95 F.2d at 309.

A sub-issue, presently a critical issue to be resolved by this Court, is whether the "boiler plate" non-waiver clause in Section 25.1 of the lease is synonymous with or distinct from more specific non-waiver clauses which include express reference to rental acceptance. One court has resolved

---

11. Compare, *Sagson Co. v. J. Leonard Weiss,* 83 Misc.2d 806, 374 N.Y.S.2d 88 (Sup.Ct.App.T. 1st Dep't 1975) (Finding of waiver despite express provision in the apartment lease that acceptance of rent with knowledge of a breached covenant was not to be deemed a waiver).

this very question. Attaching great importance to the exact language of a general non-waiver clause, a Washington court denied it any preclusive effect concerning the issue of intent. The court found such a provision lacked an *express* stipulation between the parties concerning the prejudicial effect of a receipt of rent by the lessor to that lessor's right to forfeiture premised on prior breaches. See, *Wilson v. Daniels*, 31 Wash.2d 633, 198 P.2d 496, 501 (Sup.Ct. of Wash. Dep't 1 1948).

## C.

 In the last analysis, the Lessee seeks to show an instance of "implicit" waiver. Whether the acceptance of rent accruing after a breach of a covenant in a lease raises a rebuttal presumption [12] or merely an inference of waiver,[13] the event of a rental acceptance does not establish waiver as a matter of law. *Jack O. Chertkof v. Southland Corporation*, 280 Md. 1, 371 A.2d 124, 127 (Ct.App.1977). A waiver, the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the proposed advantage. *Gerald R. Hadden v. Consolidated Edison Company of New York, Inc.*, 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978). Waiver is a matter of intent which necessarily depends on the factual circumstances of each case. *Sessions, Inc. v. Morton*, 491 F.2d 854, 858 (9th Cir. 1974) and cases cited therein. The acceptance of rent is evidence to be considered by the trier of fact, but is not necessarily conclusive. *Id.*

 The facts of this case support, by a preponderance, the finding of an intention by the Lessors to waive the Lessee's breach-

es under Section 4.4. On the record, an intention to enforce strictly the mortgage payment provisions is lacking and implicit waiver is concluded. In addition to the simple acceptance of rent on June 5, 1978, the Court finds no affirmative conduct to qualify or preserve the Lessors' rights to enforce Section 4.4 when accepting such payment. The cited payment is a payment in advance and its acceptance is conduct which supports an election and affirmance to continue the lease for the entire month of June, 1978. Most disturbing to the Court is testimony at trial (R. 7/26/79 pp. 180–183, 186; contra, E.B.T. 3/12/79 pp. 95–96) by a Lessor that as early as May 21st or 29th, 1978, there was serious contemplation and discussion to terminate the lease. Why was such an intent never communicated to the Lessee and rent received and accepted afterwards?

Also, the Lessors were on notice by the mortgagee, Guardian, as of April 18, 1978, that breaches existed under Section 4.4. By the terms of the Guardian Notice of Default the Lessors had thirty (30) days to cure the cited defaults. But for a phone call to the Lessee amounting to a mere verification of the mortgagee's Notice, the Lessors did not communicate any insistence on immediate cure even though the Lessors were forewarned by that Notice of Default of the substantial jeopardy (foreclosure action) possible. In fact, the Lessors had the alleged right under the lease to terminate the lease available to them on or about May 13, 1978. The Lessors' acceptance of rent payment without qualification or exception juxtaposed upon the time frame of inactivity connotes inconsistent conduct tantamount to abandonment of the Lessors' right to terminate the lease.[14] *Matter of the*

---

12. See, *Rose and Crown, Ltd. v. Shaw Enterprises, Inc.*, 28 Md.App. 548, 557, 346 A.2d 459, 464 (Ct.Spec.App.1975).

13. See, *In re Wil-low Cafeterias, Inc.*, supra, at 309.

14. The record does not lead this Court to a conclusion as found in *Lewis v. Clothes Shack, Inc.*, 62 Misc.2d 767, 770, 309 N.Y.S.2d 513 (Civ.Ct. City of N.Y. Trial T. N.Y.Co.1970), re-

versed, 67 Misc.2d 621, 322 N.Y.S.2d 738 (Sup. Ct.App.T. 1st Dep't 1971) ("all the acts of the landlord in this case indicate an intention to enforce the lease provision"; "Throughout the landlord insisted that the tenant cure the violation"), or in *Foureal Company v. National Molding Corporation*, 74 Misc.2d 316, 318, 344 N.Y.S.2d 598 (2nd Dist. Ct. Suffolk Co. 1973) ("Here the tenant had every reason to believe that the landlord would not be likely to *overlook a breach*, but would rather pounce upon

*Bohack Corporation,* 1 B.R. 1221, 1222, Bankr.L.Rep. (CCH), para. 65,761 (Bkrtcy.E. D.N.Y.1975). Although the Lessors' Termination Notice soon followed the receipt and acceptance of the June rent, the waiver of the right to declare a forfeiture of a lease by a breach is irrevocable. *Thomas L. Perry v. Floyd Waddelow,* 145 F.Supp. 349, 350 (E.D.Ill.1956).

## IV.

■■■ The Lessee made an argument in its pre-trial brief based on the defense of equitable estoppel against the asserted breaches under Section 4.4. The Court now reviews the record to evaluate such a contention against the Lessors. The doctrine of equitable estoppel should be applied with great caution when dealing with realty. *Huggins v. Castle Estates, Inc.,* 36 N.Y.2d 427, 433, 369 N.Y.S.2d 80, 330 N.E.2d 48 (1975).

■■■ In *United States v. Bedford Associates,* 491 F.Supp. 851, 866–67 (S.D.N.Y. 1980) the elements of equitable estoppel under New York law are stated.[15] The essential elements relating to the party to be estopped are: (1) conduct which amounts to false representation or concealment of material facts or which gives the impression that the facts are otherwise than as asserted, (2) *intention or expectation that such conduct would be relied upon by the other party,* and (3) actual or constructive knowledge of the real facts. The elements relating to the party asserting the estoppel defense are: (4) lack of knowledge of the real facts, (5) reliance on the conduct of the party to be estopped, and (6) action based thereon resulting in a prejudicial change of position. To these elements a qualification must be added. For the court to invoke the estoppel principle against a landlord, it must be shown that the claimed injured party acted in good faith. *McClelland v. Robinson,* 94 Misc.2d 308, 309, 405 N.Y.S.2d 163 (Civ.Ct. City of N.Y., N.Y.Co.1978), *mo-*

*tion denied,* 94 Misc.2d 312, 405 N.Y.S.2d 165 (1978); see also, 21 N.Y.Jur., Estoppel, Ratification, and Waiver, § 62.

The record bears these facts concerning the party to be estopped (Lessors):

(1) The conduct by the Lessors was not to enforce or insist on strict compliance or prompt payments to any mortgagees as was covenanted by the Lessee in Sec. 4.4. This conduct of laxity spans from March 1976 to May of 1978. During such period, the Lessee failed to timely pay the Guardian mortgage on no less than seven (7) occasions. Situations when such uncured defaults existed for over twenty-five (25) days (thereby devolving a power of termination to the Lessors under Sec. 31.1(a)) presented themselves on at least three occasions. (Ex. V–1 to V–11 and Ex. XIX). The breaches were substantial amounts ranging between $24,000 to $47,000. This course of conduct by the Lessors negates a desire to have the Lessee diligently fulfill its duties under Section 4.4 of the lease.

(2) An expectation that such conduct could be relied on by the Lessee appears clear. Certainly the Lessors should have known or had reason to believe or expect that continued laxity in enforcing the payment covenant would lead the Lessee to believe its duties under Sec. 4.4 which protected the Lessors interests were superfluous to its duties to the mortgagee directly.

(3) It is undisputed that the Lessors received from the mortgagee, Guardian, formal notice of the actual magnitude and particulars of the Lessee's mortgage defaults over the course of 1976 to 1978. In turn, their rights to terminate under the lease are clearly spelled out in provision 31.1(a).

The Lessee asserting this estoppel defense shows

any opportunity to lawfully terminate the lease.")

15. Compare, *Rosenthal v. National Life Insurance Company,* 486 F.Supp. 1018, 1023 (S.D.N.Y.1980) (elements of estoppel defense asserted against federal claim).

(4) The real fact not known to the Lessee was an insistence by the Lessors that there be timely and full payment according to the outstanding mortgage schedules. Such breaches were fully known to the Lessors. Basically, it was never conveyed to the Lessee that this type of default would not be tolerated.

(5) Reliance appears self-evidence. Certainly the Lessee relied on nonenforcement of Sec. 4.4 over the last couple of years. In the one instance when there was an apparent assertion of rights under Section 4.4 by the Lessors (letter of January 11, 1978, Ex. V–7) the outstanding default was immediately cured in full. (Ex. V–8) Such warning (notice) by the Lessors was a one time occurrence and subsequent defaults in February and April of 1978 brought no further prompting of compliance by the Lessors. Such an extended indulgence to the Lessee does constitute a justifiable excuse for the nonobservance of duties to the Lessors.

(6) Substantial balances of the mortgage debts were decreased over this two year period, for the Lessee always expected to enjoy and occupy the premises for the full thirty (30) years term of the lease. It is nonsensical to believe that the Lessee would continue to incur trade debts, taxes, and make mortgage payments, often in preference to noncollateralized debts, while flirting with a probability of accelerated expiration of the lease's term. The efforts to service the mortgage debts strained the cash flow and liquidity of this business concern. The prejudice or change in position by the Lessee is evidenced by its allowing any mortgage defaults to exist for over 25 days and thereby unknowingly risking expiration of the lease and loss of the possession and use of improvements which it was financing. In contract to this absolute and irrevocable loss by default, the mortgagor-Lessee always has the right of redemption in a foreclosure action when payments are in default and the mortgagee, e. g., Guardian, seeks its remedies. See, 38 N.Y.Jr., Mortgages and Deeds of Trust, § 281 and § 282.

The Court is satisfied as to the Lessee's good faith reliance. In fact, the Lessee presented evidence indicative of its realization of the impropriety of its numerous defaults. The record illustrates its efforts to refinance the outstanding mortgages and simultaneously seeking to cure existing defaults by obtaining a short term loan from a third financial institution. These actions were commenced at the very beginning of 1978 prior to the default in question. In accordance with the above findings of fact and application of law, this Court finds that the Lessors are equitably estopped by their conduct from asserting their legal right of strict compliance with the mortgage payment duties covenanted by the Lessee in Section 4.4 of the Lease.

In conclusion, the particular requisite outstanding breach under Section 4.4, necessary to invoke the conditional limitation, was nonexistent at the date the Lessors sent their Notice of Termination of Term. As a court of equity, this Bankruptcy Court finds the Lessors (1) waived such a breach or (2) are now estopped from asserting such a breach in the lease if indeed the so-called conditional limitation clause were found to be effective.

### V.

Absent overriding equitable considerations a bankruptcy judge in a Chapter X or XI proceeding is charged with enforcing valid lease terminations against debtors still in possession not only in the § 70(b) [Bankruptcy Act] situation of a bankruptcy clause, but also when termination is *based on other lease provisions having nothing to do with bankruptcy.* (Emphasis added) *In re D. H. Overmyer Co., Inc.,* 510 F.2d 329, 333 fn. 2 (2nd Cir. 1975). Apart from the intricacies of this lease's wording which creates a conditional limitation in the Lessors, this Court now reviews the posture of the

New York courts relative to judicial enforcement of a lease's conditional limitation. The Lessors appear to contend by citation to *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E. 868 (1968) that New York courts without qualification enforce conditional limitations in all leases.

■ Lacking in the *First National Stores* case, its predecessor and successors [16] is a finding that enforcement of the conditional limitation or acceleration upon default clause in the given agreements would work a forfeiture or penalty to the defendant. The New York Court of Appeals observed in *J. N. A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 397 N.Y.S.2d 958, 366 N.E.2d 1313 (1977) that

> "There are several cases in which this court has denied a tenant or mortgagor equitable relief because of his own neglect to perform within the time fixed in the lease or mortgage, but only when it has found that there was 'no penalty, no forfeiture'." *Id.*, at 399, 397 N.Y.S.2d 958, 366 N.E.2d 1313.

In *J. N. A. Realty Corp.*, equitable relief from expiration of a lease by reason of a tenant's omission was granted. Critical to the Court of Appeals granting such relief was the clear potential for a substantial forfeiture of the Lessee's recent improvement expenditures. Left for the trial court's finding was a taking of proof of any prejudice to the Lessor by nonenforcement of the literal provisions of the lease. In the case at bar, the Lessee has a right of redemption [17] for defaults under any mortgages and the Lessors have illustrated no future prejudice to them but for the risk of foreclosure proceedings to their subordinated interests. On this record and the New York case law, this Court believes the Lessee should qualify for the equitable relief from the pre-petition conditional limitation and its accompanying forfeiture.

■ Also, the exercise of a conditional limitation might not be enforced in the name of equitable "good faith dealing" when it is implemented by a notice (1) deemed given when mailed, and (2) preceded by no Lessor warning that such conditional limitation is going to be enforced after a course of conduct over years that acquiesced in a breach which is a condition precedent to the power of the limitation. See, *57 East 54 Realty Corp. v. Gay Nineties Realty Corp.*, 71 Misc.2d 353, 335 N.Y.S.2d 872 (Sup.Ct.App.T. 1st Dep't 1972). That appellate level court expressly held *First National Stores* distinguishable on its facts and therefore not controlling on their case. This Court finds striking similarities of fact between the *57 East 54 Realty Corp.* case and the case at bar. That authority persuades this Court that the New York courts would not strictly enforce the Lessors' pre-petition conditional limitation under the facts of this case. In *conclusion*, it appears that the Lessee may very probably qualify for nonenforcement of the pre-petition conditional limitation if litigated in the New York courts because of the presence of equitable considerations favorable to the Lessee and recognized under New York decisional law. With clear observance to New York law, this Bankruptcy Court declines to enforce the pre-petition conditional limitation against the Lessee.

■ The pre-petition Notice of Limitation of Term therefore may be given no effect by reason of waiver, estoppel and equitable considerations even if the termination clause in the lease were found operative, which this Court doubts.

Having found the clause inoperative, Lessee's term did not come to an end automatically by the sending of the Notice of June 19, 1979.

## VI.

Turning now to the post-petition Notice of Limitation of Term, we find that the

---

**16.** See, *Graf v. Hope Building Corporation*, 254 N.Y. 1, 171 N.E. 884 (1930) cited in *First National Stores*, at p. 638, 290 N.Y.S.2d 721, 237 N.E.2d 868, and *Fifty States Management Corporation v. Pioneer Auto Parts, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979).

**17.** See, 38, N.Y.Jur. Mortgages and Deeds of Trust, § 281 and § 282.

Lessors, as an alternative ground for relief, assert that the lease was lawfully terminated on October 27, 1978 due to the Lessee's filing of a reorganization petition under Chapter X of the Bankruptcy Act of 1898. The operative termination provision of the lease is a 'bankruptcy termination clause' in Section 32.1. Upon Lessee's filing the petition, that clause creates an option in the Lessors to immediately cease and terminate the lease and grants rights of re-entry and possession to said premises, furnishings, fixtures, and equipment therein.

On October 27, 1978 the Lessors did timely and in proper form notify the Lessee and the Trustee in bankruptcy of their election to terminate under provision 32.1 (Exhibit JJ). By virtue of such election, Section 21.1 of the lease operates to vest title to the aforesaid property in the Lessors. All those properties are subject to outstanding mortgages to which the Lessors have subordinated their leasehold and fee interests and their interests in the improvements.

### A.

The Lessors contend that a bankruptcy termination clause is clearly enforceable even when equity would clearly dictate otherwise. (Lessors Brief, p. 25). Supporting this contention is a citation to *W. F. M. Restaurant, Inc. v. Austern*, 35 N.Y.2d 610, 364 N.Y.S.2d 500, 324 N.E.2d 149 (1974) in which the New York Court of Appeals upheld a landlord's exercising a termination of a lease under a so-called 'bankruptcy clause' in the lease. This Court rejects the Lessors' contention and views the cited authority as inapplicable.

The *Austern* case dealt with an involuntary petition which was *dismissed* and the related subsequent actions of landlord and creditors. Because the petition in *Austern* was dismissed, the New York court had sole jurisdiction to resolve this private dispute. The relief sought by the Lessee was for a state court, in the name and power of equity, to recast the operative effect of a contractual provision which gave the landlord a right to terminate the lease. While refusing to undo the effect of the

bankruptcy clause, the state court keenly observed that

"(F)ederal bankruptcy cases arise under statutes which look to the protection of the debtor's creditors and generally to the public interest .... Under the supremacy clause (citation) and the Federal bankruptcy statutes, (citations) bankruptcy courts undoubtedly have a power *broader than* that of a court resolving a private dispute between landlord and tenant (citation) ...." (Emphasis added) *Id.*, at 616, 364 N.Y.S.2d 500, 324 N.E.2d 149.

Equitable principles to avoid a forfeiture of a lease are applied by bankruptcy courts for the benefit of a lessee's creditors and the public interests served by a reorganization or arrangement proceeding. See, Bankruptcy Act of 1898, § 101, § 301, 11 U.S.C. § 501, § 701.

### B.

It is well settled that § 70(b) of the Bankruptcy Act of 1898, 11 U.S.C. § 110(b), is applicable to Chapter X proceedings. *Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 502 (1945); Bankruptcy Act of 1898, § 102, 11 U.S.C. § 502. It reads in pertinent part:

"(A)n express covenant (in a lease) that ... the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same shall be enforceable."

Yet, it was observed in *Matter of Garfinkle*, 577 F.2d 901, at 904–905 (5th Cir. 1978) that

"(T)he issue of whether such a clause is enforceable is *separate and distinct*, however, from the issue of whether its *enforcement in a particular case* would be inconsistent with other provisions of the Bankruptcy Act, *Smith v. Hoboken Railroad, Warehouse and Steamship Connection Co.*, 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1945); *In re Fleetwood Motel Corporation*, 335 F.2d 857 (3rd Cir. 1964); or is inequitable in the particular circumstances before the court. *Queens Boulevard Wine & Liquor v. Blum*, 503 F.2d 202 (2nd Cir. 1974)." (Emphasis added).

Strict enforcement of conditional limitations premised on a lessee's filing for bankruptcy relief, authorized under § 70(b) of the Bankruptcy Act, has suffered a slow decimation [18] under the aegis of the inherent powers of bankruptcy courts as courts of equity. See, *In re Fleetwood Motel Corporation*, supra; *Weaver v. Hutson*, 459 F.2d 741 (4th Cir. 1972), *cert. denied*, 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1973) (White, J., dissenting); *Queens Boulevard Wine & Liquor v. Blum*, supra; *In re Fontainebleu Hotel*, 515 F.2d 913 (5th Cir. 1975); *In the Matter of M & M Transportation*, 437 F.Supp. 821 (S.D.N.Y.1977); contra, *In re Gilchrist Company*, 2 B.R. 1094, 1096, Bankr.L.Rep. (CCH), para. 66, 108 (Bkrtcy.E.D.Pa.1976); *Matter of Hough Manufacturing Corporation*, 1 B.R. 69 (Bkrtcy.W.D.Wis.1979).

Most recently it was held in *Matter of M & M Transportation Company*, 437 F.Supp. 821, at 822 (S.D.N.Y.1977) that a bankruptcy judge

" . . . clearly has the power, in his equitable discretion, to prevent the termination of leases containing bankruptcy default provisions. That was established beyond peradventure in *Queens Boulevard*, supra, and *In re D. H. Overmyer Co., Inc.*, 383 F.Supp. 21 (S.D.N.Y.1974), *aff'd*, 510 F.2d 329 (2nd Cir. 1975)."

Albeit, this Bankruptcy Court is cognizant that not every corporate entity can be successfully rehabilitated nor that every reorganization proceeding requires such exercise of discretion. *In re D. H. Overmyer Co., Inc.*, supra, p. 24; in accord, *In re Webcor*, 392 F.2d 893, 897 (7th Cir. 1968), *cert. denied*, 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968).

It cannot be denied that such power exercised in favor of the Lessee works a hardship on the landlord who expects to rely on the lease's written contractual provisions to legally protect his property interests. Therefore, it should always be kept in mind that

"While equity historically has been the forum in which forfeitures may be set aside, no one has suggested that when the equities appear to be evenly balanced or balanced on the side of the forfeiture the Court, should (still) grant such relief," *In re D. H. Overmyer Co., Inc.*, supra, at 24. Basically, this Court, notwithstanding § 70(b), must determine the equities which would flow from termination as opposed to nontermination of the lease.

### C.

From the circumstances of this case, the Court finds these equities of the parties to exist:

The Lessee

1) has an enterprise with economic viability as a motor hotel which is adjacent to and accessible from a major transportation artery—the New York Thruway;

2) its leasehold interest embodies the primary asset upon which this reorganization proceeding can be successful. Termination of the leasehold by operation of the bankruptcy clause will mandate conversion to Chapter 7 liquidation;

3) a termination of the leasehold will be very premature relative to the original thirty (30) year term plus options granted in 1966;

4) the Lessee will suffer a devastating loss of all equity in the mortgaged improvements which approximates $475,000.00. The Lessors will make a premature windfall gain under the terms of the lease;

5) considering outstanding claims entitled to priority payment under § 64 of the Bankruptcy Act of 1898, there exists a high probability that this case, as a Chapter 7, will yield no dividend to unsecured (trade or lending) creditors.

The testimony of Mr. Blum, Trustee, bears out the fact that a substantial

---

**18.** The Bankruptcy Reform Act of 1978, Pub.L. No.95–598, Title I, § 365(e) has adopted the cited case law, infra, and now provides that such "bankruptcy termination clauses" are not enforceable. 11 U.S.C. 365(e).

increase in room occupancy and cuts of excess expenditures have shored up this Debtor into a profit making enterprise. The Debtor-Lessee has sold its other wholly owned subsidiaries which hampered the cash flow position of this motor hotel. The leasehold's reversionary interest to the Lessors becomes a genuine forfeiture which accompanies any termination of the lease. Bankruptcy courts entertaining rehabilitative proceedings are adverse to allow "bankruptcy terminations" of a lease clearly essential to an otherwise promising rehabilitation. No greater instance of such disfavor arises than when the lease constitutes the single most paramount asset of the debtor. The equity invested in these improvements embodies the basis upon which future income is projected. Loss of possession and use of the improvements sounds a death knell. Lastly, the enforcement of the bankruptcy clause will be in derogation to the potential equitable recovery to the unsecured creditors of this Debtor. The purpose and spirit of bankruptcy laws oppose such a result.

The Lessors have stated factors for the Court's consideration to negate the exercise of equitable relief such as:

1) The Debtor has a history of mismanagement;

2) the past history of intercorporate loans taints the general conduct of the Debtor; and

3) the breach of Section 4.4 of the leasehold agreement was a substantial breach heavily jeopardizing the Lessors' fee and reversionary interests.

4) the Second Circuit's decision in *In re D. H. Overmyer Co., Inc.*, is controlling and on all fours with the case at bar.

A voluminous portion of the record concentrates on the intercorporate transactions between the Lessee and its wholly owned subsidiaries and corporate officers. These transactions extended over several years prior to the filing of the Chapter X petition. First, the narration of the Lessee's history of mismanagement is immaterial. It is merely another reason why this concern had to file for relief under the bankruptcy laws. Second, absent some clear evidence of defrauding the corporation's creditors by way of the intercorporate exchanges, this Court does not believe that what were essentially "business judgments" are within the Court's purview of scrutiny and review. Compare, *In re Gilece*, 1 B.R. 762, 765 (Bkrtcy.E.D.Pa.1980) (court refused to stay ouster of a Chapter XI corporate debtor's officer by its board of directors). Third, the Lessee appears to be a New York corporation (Petition, para. 2) and both its corporate existence and perimeters of legal activity are governed by the New York Business Corporation Law. See, N.Y.Bus. Corp.Law (McKinney 1963). The Lessors contend that the aforesaid transactions left insufficient operation and capital funds in the Lessee. Although fundamentally sound, the exchanges did undermine the Lessee's financial structure (cash flow). Again, absent a "minimum capital requirement" dictated by the New York laws, this Court finds no legally reprehensible acts by the Debtor or its officers. In conclusion, the Court does not believe these acts taint the overall conduct of the Debtor in its relations with the Lessors.

Lastly, this Court finds that preventing enforcement of the bankruptcy termination clause will not result in a prejudice to the Lessors. The focal problem of the Lessee is his inability to make timely payment to his unsecured and secured debt service. The precise relief obtainable under a Chapter X proceeding focuses on these problems. The Lessors' financial interests can only benefit from its Lessee undergoing such a reorganization. Relief under Chapter X could immediately correct and stabilize the endangerment of the Lessors subordinated leasehold, fee, and reversionary interests. The improvements at the lease's conclusion would still be surrendered to the Lessors although they would never be required to fund the outstanding mortgages.

The Lessors strenuously advocate that equity should not come to the aid of the Lessee under the facts of this case. Contending that the facts at bar are almost identical to those in *In re D. H. Overmyer*

*Co., Inc.*, supra, the Lessors view that case's resultant denial of equitable intervention as applicable precedent authority on this Court. This Court is not bound by that decision because equity courts must act upon the particular facts of the case before them. Additionally, in the *D. H. Overmyer* case there were findings with very fraudulent overtones as to the debtor's conduct which are absent from this proceeding.[19] Such findings are critical to an equity court's exercise of "justice and good conscience".

This Court, in contradistinction to the *D. H. Overmyer* case, does feel that the *In re Fleetwood Motel Corporation* and *Weaver v. Hutson* cases, supra, are persuasive authority for this Court's exercise of equitable discretion in favor of the Lessee in the context of a Chapter X proceeding. The *Weaver* court emphasized the "windfall" to lessors, *Id.*, p. 743, and the "complete emasculation of the reorganization", *Id.*, p. 744, and it therefore "declined forfeiture in the circumstances as defeating the reorganization aims of Chapter X." *Id.*, p. 745. Both cases involved subordinated reversionary interests to the Lessors of physical personal and real property improvements financed by debtor-lessee effective upon termination of the leasehold interest. Although the public interest in those cases took the form of investors capital, here there are substantial amounts of past due federal and state taxes and local employment opportunities that also support continuation of this lease.

### VII.

■ The Lessors directly attack the Lessee's filing of the Chapter X petition. (Answer, para. 5). It is contended that a plan of reorganization cannot be filed. That assertion speaks to the filing's "good faith" element. A petition's absence of good faith

is statutorily defined as being "<u>un</u>reasonable to expect that a plan of reorganization can be effected." (Emphasis added) Bankruptcy Act of 1898, § 146(3), 11 U.S.C. § 546(3).

■ It is established that the burden is on the petitioner (Lessee) to satisfy the court that a Chapter X petition has been filed in good faith. *Marine Harbor Properties, Inc. v. Manufacturers' Trust Company*, 317 U.S. 78, 84–85, 63 S.Ct. 93, 87 L.Ed. 64 (1942), *reh. denied*, 317 U.S. 710, 63 S.Ct. 254, 87 L.Ed. 566; *In re Bermec Corporation*, 445 F.2d 367, 368 (2nd Cir. 1971); *In re Holi-Penn, Inc.*, 535 F.2d 841, 844 (3rd Cir. 1976). Of course, this burden of proof cannot be met by mere allegations that the debtor can be reorganized; rather, the debtor must show that there is a 'reasonable probability or fair assurance of successful reorganization.' *In re Holi-Penn, Inc.*, supra at 844; *In re U.S.A. Motel Corp.*, 450 F.2d 499, 504 (9th Cir. 1971). The only operative presumption is that any doubt as to whether a plan of reorganization can be effected should be resolved at this initial hearing in favor of approving the petition. See, *A–Cos Leasing Corporation v. R. F. Wheless, Jr.*, 422 F.2d 522, 525 (5th Cir. 1970); in accord, *In re Lela & Company, Inc.*, 551 F.2d 399, 409 (D.C. Cir. 1977). A debtor which is a solely owned corporation with its business enterprise being conducted under its corporate name is amenable to Chapter X proceedings. *Corr v. Flora Sun Corporation*, 317 F.2d 708 (5th Cir. 1963); *In re Agregados de Manati, Inc.*, 357 F.Supp. 1263, 1265 (D.P.R.1973).

■ At the date of the petition's filing it is stated that there are approximately $1,700,000 in outstanding liabilities (i. e., secured loans, federal and state taxes, trade

---

**19.** The district court made these observations: (1) "Just prior to filing its Chapter XI petitions, Overmyer made promises with respect to remedying these defaults which could only have been *made with an intent to deceive.*" (Emphasis added) 383 F.Supp. at 24, summarized at 510 F.2d 333; (2) "The landlord was induced to enter into this stipulation on the specific assurance of the debtor that 'there was no

bankruptcy contemplated...' The stipulation and judgment were signed on October 29, and filed November 9, 1973—only seven days before Overmyer began Chapter XI proceedings." 383 F.Supp. at 26; and (3) "When the landlord thereafter commenced an action for possession, Overmyer entered a general denial, *clearly a sham answer meant only to create delay.*" (Emphasis added) *Id.*

accounts, an unsecured note, etc.). The Court has accepted testimony that an approximate fair market value for this business is in the range of $2,600,000 to $2,700,000. Such excess value shows a good debt to equity ratio and, in turn, a high prospect for refinancing this going concern. The Court is also encouraged by the Trustee's Evaluation Report (R. 7/13/79 p. 129) and his five (5) year project for 100% payment to the creditors of this Debtor. Although the Debtor's past history connotes some secured creditor resistance[20] and other economical obstacles common to the entire motel industry, at this initial hearing the Court finds the existence of a reasonable expectation that a plan can be formulated and put into effect.

## CONCLUSIONS OF LAW

This Court can only conclude that by the facts presented it is empowered to: refuse enforcement of this lease's pre-petition conditional limitation provision; mitigate the harsh consequences of forfeiture expressly allowed under § 70(b) of the Bankruptcy Act of 1898; prevent the substantial injustice to this Lessee, its general unsecured and secured creditors and frustration of Chapter X purposes that an enforcement of the cited conditional limitations would entail.

In accordance with Rule 10–113(c)(2) of the Rules of Bankruptcy Procedure, this Court holds that

(1) the said lease is an asset of the Lessee and is still in effect and executory;

(2) the petition for reorganization under Chapter X of the Bankruptcy Act complies with the requirements of Chapter X;

(3) it is not unreasonable to expect that a plan of reorganization can be effected; therefore the petition has been filed in good faith;

(4) in accordance with § 141 of the Bankruptcy Act of 1898, the petition should be and is hereby approved.

---

**20.** The Court notes that secured creditor resistance is only one factor in a determination of "good faith". See, *In re Bermec Corporation*, supra, at 369; *In re Northeast Corporation*, 519

The Court, under § 2(a)(18) of the Bankruptcy Act of 1898, 11 U.S.C. § 11(a)(18), does not award statutory costs against the objecting Lessors.

The above constitutes the Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

F.2d 1360, 1363 (4th Cir. 1975), *aff'ing*, 379 F.Supp. 1084 (W.D.Va.1974); *In re Holi-Penn, Inc.*, supra, at 844.